**UNITED STATES of America,**
**Appellant,**

v.

**Ellett R. DOGAN, Sheriff and Tax Collector, Tallahatchie County, Mississippi, et al., Appellees.**

No. 19638.

United States Court of Appeals
Fifth Circuit.

Jan. 26, 1963.

Rehearing Denied May 10, 1963.

H. M. Ray, U. S. Atty., Oxford, Miss., Burke Marshall, Asst. Atty. Gen., Harold H. Greene, Howard A. Glickstein, John Doar, Gerald P. Choppin, Attys., Dept. of Justice, Washington, D. C., for appellant.

Peter M. Stockett, Jr., Will S. Wells, Asst. Attys. Gen., Jackson, Miss., George Payne Cossar, Sr., George Payne Cossar, Jr., Hamilton Caldwell, Charleston, Miss., J. J. Breland, John W. Whitten, Jr., Sumner, Miss., Joe T. Patterson, Atty. Gen. of Mississippi, Dugas Shands, Asst. Atty. Gen. of Mississippi, Darryl A. Hurt, Special Asst. Atty. Gen. of Mississippi, Jackson, Miss., for appellees.

Before RIVES and WISDOM, Circuit Judges, and BOOTLE, District Judge.

BOOTLE, District Judge.

Here we have the unusual charge made that citizens are desirous of paying taxes and are not permitted to do so. This charge tends to become understandable when we learn that the taxes involved are poll taxes, that under the constitution and laws of Mississippi there is a close tie-in between the payment of poll taxes and the exercise of the franchise, and that the complaint filed in the District Court for the Northern District of Mississippi is in the name of The United States by the Attorney General under the Civil Rights Act, as amended, 42 U.S.C.A. § 1971, on behalf of aggrieved Negro citizens. The defendants are Ellett R. Dogan, Sheriff and Tax Collector of Tallahatchie County, Mississippi, Tom E. Harris, Circuit Court Clerk and Registrar of said County, and the State of Mississippi. The complaint alleged that at least since 1946 the Sheriffs of Tallahatchie County, including the incumbent Dogan, have followed the policy and practice of refusing to permit Negro citizens of said County, but not white citizens, to pay their poll taxes; that this policy and practice had deprived Negro citizens of the right to vote without distinction of race or color, and deterred Negro citizens on account of their race or color from attempting to register to vote. A preliminary and permanent injunction was sought against the Sheriff and the State of Mississippi to enjoin the acts and practices charged against the Sheriff, the complaint having been amended in this regard by adding allegations that Sheriff Dogan had failed and refused to afford to Negro citizens of said County the same and equal opportunity to pay poll taxes as is afforded to white citizens, and that Dogan's acts and practices had delayed, prevented, hindered, and discouraged Negro citizens on account of their race from paying their poll taxes. At the hearing for preliminary injunction no relief was sought against Tom E. Harris, the Circuit Court Clerk and Registrar of said County, the motion for preliminary injunction seeking to restrain the Sheriff and the State of Mississippi during the pendency of the action from: 1) engaging in any acts which would deprive any citizen in Tallahatchie County of the right to vote without distinction of race or color; 2) engaging in any acts which would delay, prevent, hinder,

or discourage Negro citizens on account of their race or color from paying their poll taxes; 3) failing and refusing to accept and receive payment of poll taxes and issue receipts therefor from any Negro citizen legally assessed or assessable for such taxes in said County and State.

The complaint was filed on November 17, 1961. The motion for preliminary injunction was noticed for hearing for December 13, 1961, on which date there was taken up for hearing motions of Dogan and the State of Mississippi to strike from the complaint and from supporting affidavits attached thereto all averments recounting how Negroes, since 1951, had, from time to time, been rebuffed in their efforts to pay poll taxes, the objective of the motions to strike being to remove from the scope of the law suit all alleged acts of discrimination occurring prior to September 9, 1957, the effective date of the Civil Rights Act of 1957, or, in the alternative, prior to December 24, 1959, the date on which Sheriff Dogan assumed office. The court ruled that it had "some doubt that any evidence of the present Sheriff earlier than the effective date of the Civil Rights Act of 1960 which is May 6, 1960, should be considered on this hearing," but that "out of an abundance of caution, I will permit on the hearing to be had on the question of whether or not the court will issue a temporary injunction evidence to come in from December 24, 1959 * * * the day upon which this Sheriff * * * assumed office * * *." The court further held that the State of Mississippi was a proper party, and that the issue of whether or not a pattern or practice of discrimination existed within the meaning of subsection (e) of section 1971 had to be resolved in a separate law suit, or at least a separate evidentiary hearing. The hearing on the motion for preliminary injunction was reset for December 20, 1961 and after hearing evidence then for portions of three days the court took time for consideration and, on January 19, 1962, handed down its opinion. The court found that payment of poll taxes for two successive years next before an election is a prerequisite to voting in Mississippi,[1] except that at age 21 a new voter is exempted and there is no liability for poll tax after age 60. The court expressed doubt as to whether the Civil Rights Act had application to discrimination in the payment of poll taxes, stating that it thought defendants' position—that the statute applied only to the physical act of voting—was a reasonable one. The court said that in its strongest light for the plaintiff the evidence showed that only four members of the Negro race ever applied to pay poll taxes during the incumbency of Dogan and that of these four two were exempt from payment because of age. With respect to the remaining two applicants, the court concluded that their efforts to pay the poll taxes "were superficial at best", and did not "carry the hallmark of bona fide efforts in good faith to pay poll taxes." The court found that Dogan had issued instructions to his deputies to advise all Negroes who desired to pay a poll tax to see him personally, and recited the Sheriff's testimony that his reason for these instructions was because he had heard of investigations into voting matters in the county and he wanted first hand personal knowledge of all circumstances involved in any occurrence that might take place with regard to the payment of poll taxes by Negroes. The court commented further, "the evidence also shows that during the time with which we are concerned, anyone who came into either of the offices[2] for the purpose of paying poll taxes would be issued a poll tax receipt by the deputies in charge of the office if the taxpayer was personally known to them as being qualified to pay

1. Section 3160 Mississippi Code, 1942, Recompiled.

2. There are two county seats in this county, and the Sheriff and Tax Collector maintains an office in each place—Charleston and Sumner.

poll taxes, or, in some cases, when the person was found to be so qualified from the poll tax records in the office."[3] The court found that the voting age population of Tallahatchie County consists of approximately 5,099 white persons, and approximately 6,483 Negroes. It also found that no Negroes had paid poll taxes during the tenure of Sheriff Dogan, or had been issued poll tax receipts. The court continued, "there is nothing in the evidence to indicate in any way why only two members of the Negro race who are liable for the payment of poll taxes in order to vote, have concerned themselves in any way with such payment during the time with which we are concerned * * *. Thus the two who expressed some interest as aforementioned in paying poll taxes would amount to about 1/20th of 1% of the non-exempt voting age Negro population * * * [and] when weighed in the light of plaintiff's allegations and claims of general discrimination 1/20th of 1% falls almost into the realm of 'de minimis.' " An order in accordance with the opinion was issued on January 19, 1962 denying the motion for preliminary injunction.

On this appeal appellant urges two specifications of error. 1) That the District Court erred in refusing to find that distinctions on account of race or color have been made in the collection of poll taxes in Tallahatchie County. 2) That the District Court erred in excluding evidence of racially discriminatory acts occurring prior to the incumbency of Sheriff Dogan on December 24, 1959.

■■ Discussing these alleged errors in inverse order, we think that the second specification of error is well taken. The appropriateness, in fact, the necessity, of admitting evidence of acts of discrimination prior to the beginning of the Sheriff's term of office is demonstrated by some of the reasoning employed by the District Judge in denying the temporary injunction. He based his

denial largely upon the fact that only four Negroes had sought to pay poll taxes during the Sheriff's term, and that there was "nothing in the evidence to indicate in any way why only two members of the Negro race who are liable for the payment of poll taxes in order to vote, have concerned themselves in any way with such payment during the time with which we are here concerned. The record is silent in that regard." The record was silent in that regard because of the court's ruling that he would not admit any evidence of alleged discrimination prior to the beginning of the Sheriff's term. In fact, he sustained a motion of defendants to strike from the complaint and its supporting affidavits all averments of prior discrimination. If that evidence had been admitted, according to the affidavits themselves attached to the complaint, the record would show that one of these Negroes, Birdie Kegler, had been trying to pay her poll taxes "to the Sheriff's office since about 1951, but they have never allowed me to pay it." Her affidavit shows that she first tried to pay her poll tax around 1951; again in December, 1952; again in 1954; that she tried to catch the Sheriff in his office in December, 1955, or January, 1956, but failed; that she did not actually offer to pay in December, 1955, or January, 1956, because she had been told she had to catch the Sheriff; and that she tried again to pay in 1957, all prior to the December, 1959 and January or February, 1961 efforts, to which her evidence was restricted. Her affidavit shows that had she been permitted to testify she would have said that on all of these efforts she never was allowed to pay her poll tax, the "man behind the counter" usually just saying "no". If the evidence had not been thus timewise limited another Negro, Grafton Reid Gray, according to his affidavit, attached to the complaint, would have related that in January, 1952 he went to the Sheriff's

---

**3.** Here, the distinguished trial judge was obviously referring to the records with respect to white persons applying to pay poll taxes because he had already found, as demanded by the evidence, that according to the sheriff's instructions all Negroes who desired to pay a poll tax were to be told to see the Sheriff personally.

office with Richard Carter, who announced that they had come to pay their poll tax when the deputy sheriff in charge replied that "no nigger" could pay his poll tax there; that again in January, 1953, he and three other Negro school teachers went to the Sheriff's office to pay poll taxes and the same deputy sheriff instructed them that they would have to see Sheriff Strider, and that again about 1954, or 1955, he and Reverend Leslie Terry went to the Sheriff's office and told the same deputy, Mr. Burnett, that they had come to see if they could pay their poll taxes, and Mr. Burnett replied that they would have to see Sheriff Strider, and that Mr. Burnett stated in answer to their inquiry that he did not know when the Sheriff would be in. This evidence of prior discrimination and of continuously unsuccessful efforts on the part of Negroes to pay poll taxes would have thrown light upon the question why there were so relatively few efforts on the part of Negroes to pay their poll taxes during the present Sheriff's term. It was admissible for that purpose. This is especially so since Sheriff Dogan was a deputy sheriff in the same county for three years immediately prior to the beginning of his present term, and was thus identified with the previous administration which, under the evidence, no more than the present one permitted Negroes to pay poll taxes. Moreover, this evidence was clearly admissible against the State of Mississippi, also sought temporarily to be enjoined. Section 1971(c), Title 42, U.S.C.A., expressly authorizes the naming of a State as a party-defendant in a case of this kind and the District Court ruled that the State of Mississippi was properly named as a defendant in this case. "Relief under § 1971(c) is not confined to named individual voter officials but extends as far as the sovereign State itself." Kennedy v. Lynd, 306 F. 2d 222, 228 (5th Cir., 1962).

■ The trial court took too narrow a view of the old R.S. § 2004, derived from § 1 of the Act of May 31, 1870, presently 42 U.S.C.A. § 1971(a). That statute forbids any distinction in the voting process based upon race or color, irrespective of whether such distinction involves an actual denial of the vote. It applies not only to the physical act of voting but to the entire voting process, including the matter of paying poll taxes where the payment of poll taxes is a condition precedent to the right to vote, and including the matter of registration where registering is required in advance of voting. Lane v. Wilson, 307 U.S. 268, 275, 277, 59 S.Ct. 872, 83 L.Ed. 1281, 1287 (1939); Sharp v. Lucky, 252 F.2d 910, 913 (5th Cir., 1958); United States v. Raines, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960); United States v. Raines, 189 F.Supp. 121, 133 (M.D.Ga. 1960); Anderson v. Courson, 203 F. Supp. 806, 810 (M.D.Ga.1962); Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944); Davis v. Schnell, 81 F.Supp. 872, (S.D.Ala.1949), aff'd, 336 U.S. 933, 69 S.Ct. 749, 93 L.Ed. 1093 (1949); Byrd v. Brice, 104 F.Supp. 442 (W.D.La.1952), aff'd, 201 F.2d 664 (5th Cir., 1953).

■■ There is another reason why evidence of pre-Dogan discriminatory acts was admissible. This complaint invoked also subsection (e) of 42 U.S.C.A. § 1971 by alleging that the deprivations complained of were pursuant to a pattern and practice and invoked a finding by the court to that effect. The trial court thought that perhaps a separate law suit was necessary for the determination of this pattern and practice question. In this he was in error. Certainly there is nothing in the statute to suggest that two actions or law suits are to be required. The opening sentence of subsection (e) reads:

"(e) In any proceeding instituted pursuant to subsection (c) of this section in the event the court finds that any person has been deprived on account of race or color of any right or privilege secured by subsection (a) of this section, the court shall upon request of the Attorney General and after each party has been given notice and the opportun-

ity to be heard make a finding whether such deprivation was or is pursuant to a pattern or practice."

Only one "proceeding" is contemplated. Good judicial husbandry indicates and we hold that only one hearing is required and that at such hearing the court should admit any and all relevant evidence on the question of deprivation, and also on the question of pattern or practice.[4] This holding seems to be in accordance with the uniform procedure heretofore adopted by the trial courts. See United States v. State of Alabama, 192 F.Supp. 677 (M.D.Ala.1961), aff'd, 304 F.2d 583 (5th Cir., 1962); United States v. Manning, 205 F.Supp. 172 (W.D.La.1962); United States v. Association of Citizens Councils of La., 196 F.Supp. 908 (W.D. La.1961), and United States v. Raines, 189 F.Supp. 121 (M.D.Ga.1960).

■■ We think, too, that the United States must prevail on the remaining specification of error, and that the District Court erred in refusing to find that distinctions on account of race or color have been made in the collection of poll taxes in Tallahatchie County, and erred in denying the preliminary injunction against Sheriff Dogan as prayed. We are forced to this conclusion notwithstanding our full recognition of the applicable rule that denial of a preliminary injunction will not be set aside on appeal unless the District Court's action constitutes clear error or an abuse of discretion. See Detroit Football Co. v. Robinson, 283 F.2d 657 (5th Cir., 1960); Reliable Transfer Co. v. Blanchard, 145 F.2d 551, 552 (5th Cir., 1944). A careful scrutiny of the evidence adduced in the trial court discloses that beyond question racial discrimination was being practiced, even up to the last day of the taking of evidence on the hearing of the motion for preliminary injunction. As was stated in State of Alabama v. United States, 304 F.2d 583, 586 (5th Cir., 1962), "In the problem of racial discrimination, statistics often tell much,

and Courts listen." With the voting age population of Tallahatchie County consisting of 5,099 white persons and 6,483 Negroes, with counsel and witnesses during this three-day hearing being unable to locate from the records or from memory any Negro citizen who had ever been permitted to pay poll tax in Tallahatchie County, the standing instructions of Sheriff Dogan "that if any Negroes came there to pay their poll tax for them to see me", whereas white people were referred to him by his deputies in regard to poll tax payments only "if there was any question of their precinct or qualification", assume vital significance. Those instructions were outstanding at the hearing of the motions to strike on December 13, 1961 and were not modified until Sunday, December 17, 1961, three days prior to the beginning of the hearing for preliminary injunction. The new instructions are: "If any person comes in there, black or white, to pay their poll taxes for Tallahatchie County, if they are first payers, tell them to see the Sheriff." This new policy, while purporting to apply to Negroes and whites indiscriminately, actually operates to the disadvantage of Negroes on account of their race, as did the previous instruction. Substantially all of the 5,099 white persons of voting age who were liable to pay a poll tax have been permitted to do so while not one of the County's 6,483 Negroes of voting age has been listed as paying the tax. Obviously a blanket requirement that all persons who have never paid the poll tax before, that being a relatively small percentage of white people and all Negroes, who now desire to pay their poll tax for the first time must see the Sheriff personally operates unequally and discriminatorily against the Negroes. This calls to mind the cases of Guinn v. United States, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340 (1915), and Lane v. Wilson, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281 (1939). In Guinn, the Supreme Court struck down as violative of the 15th

4. "Establishing a 'pattern or practice' of such discrimination may go back many, many years." Kennedy v. Lynd, 306 F.2d 222, 228 (5th Cir., 1962).

Amendment the "grandfather clause" of the Oklahoma Constitution, which clause exempted from state literacy tests lineal descendants of persons who, on January 1, 1866, were entitled to vote in Oklahoma. In Guinn, the Court upheld the contention that the "grandfather clause" "by necessary result re-creates and perpetuates the very conditions which the Amendment was intended to destroy." So it can be said here. Sheriff Dogan's new instructions by necessary result re-creates and perpetuates the very discrimination which prevailed under his former instructions and practices. Prior to the new instructions of December 17, 1961, all Negroes who desired to pay poll taxes were required to see the Sheriff. Very few, if any, white persons who desired to pay their poll taxes were required to see the Sheriff. He was not able to name off-hand any white person who had been referred to him in this regard. Nor was this matter of being required to see the Sheriff personally the only element of discrimination against Negroes. The Sheriff testified, obviously referring only to white persons, as follows: "Q. Are your deputies instructed to give assistance to a tax payer who comes in if he doesn't know his voting precinct? A. They leave that up to the tax payer. Q. That's their instruction? A. That's right." No assistance was given to Negroes who wanted to pay their poll taxes. Nor was the word of a Negro taken as to his voting precinct.

Lane was a sequel to Guinn. After Guinn invalidated the "grandfather clause", Oklahoma adopted a statute which permitted previously disfranchised Negroes to qualify, provided they registered within a twelve day period. Substantial numbers of white persons because they had voted in previous elections were not so restricted. Considering this situation, the Court, in Lane, said: "We believe that the opportunity thus given [N]egro voters to free themselves from the effects of discrimination to which they should never have been subjected was too cabined and confined"

and said further "the [15th] Amendment nullifies sophisticated as well as simple-minded modes of discrimination. It hits onerous procedural requirements which effectively handicap exercise of the franchise by the colored race although the abstract right to vote may remain unrestricted as to race."

A glance at the constitution and statutes of Mississippi reveals the close tie-in between payment of poll taxes and voting, and reveals also the absence of justification for the Sheriff's rule that Negroes desiring to pay poll taxes must see him personally. Article 12, § 241 of the Mississippi constitution provides that every inhabitant of the State with certain exceptions, who meets certain other requirements and "who has paid on or before the first day of February of the year in which he shall offer to vote, all poll taxes which may have been legally required of him, and which he has had an opportunity of paying according to law, for the two preceding years, and who shall produce to the officers holding the election satisfactory evidence that he has paid such taxes, is declared to be a qualified elector." Section 9751 of the Code of Mississippi assesses and imposes annually on every inhabitant of the State between the ages of 21 and 60 years with certain exceptions a poll tax of $2.00, and requires the Sheriff and Tax Collector to collect each year the poll tax due and to issue the required receipt. Section 3163 provides that persons exempt from poll taxes may obtain an exemption certificate from the Circuit Clerk of the County. Section 3161 provides that when any person liable for the payment of poll tax pays the same on or before the first day of February of the year in which it was due the Tax Collector shall issue to him receipt therefor showing the exact date of payment, and that when any person offers to vote he shall present to the managers of the election either his poll tax receipt or his exemption certificate. Section 3160 provides that no person shall be permitted to vote in any primary election unless he possesses all qualifications

prescribed by § 241 and § 244 of the constitution of 1890, and unless "such person has paid his or her poll tax annually on or before the first day of February of the year such poll tax is due for the two (2) years prior to the time such person offers to vote, and unless * * * such person has in his or her possession at the time he or she offers to vote poll tax receipts for the two (2) preceding years * * *." Section 9919.5 [5] is the section relied upon by the Sheriff in demanding an interview with Negro applicants. It will be seen that according to this section applicants "shall present their correct names with their age, sex, place of residence, election precinct, and any other information which may be lawfully required by the sheriff * * *." It should be said to the credit of the Sheriff that he has not undertaken to set up any subjective tests under the clause "any other information which may be lawfully required", as certainly he could not do under the decision in Davis v. Schnell, 81 F.Supp. 872 (S. D.Ala.1949), aff'd, 336 U.S. 933, 69 S. Ct. 749, 93 L.Ed. 1093 (1949). And there was no excuse for his demanding verification from Negro applicants as to the correctness of their voting precincts in view of his testimony hereinabove quoted that his deputies were under instruction to leave the applicant's precinct up to the tax payer.

Discrimination being unquestionably shown under the old policy, the new policy is similarly discriminatory both in purpose and in effect. To quote from State of Alabama v. United States, 304 F.2d 583, 586 (5th Cir., 1962) the new policy is but a "deference toward apparent equality." As was said in James v. Almond, 170 F.Supp. 331, 339

(E.D.Va.1959) "equality of treatment is not achieved through indiscriminate imposition of inequalities." See also Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110, (1960) and Hunt v. Arnold, 172 F.Supp. 847 (N.D. Ga.1959).

Upon oral argument in this court, counsel for appellant called this court's attention to the prayer of the complaint that the trial court require the Sheriff to accept and receive payment from, and issue receipts to, any Negro legally assessed or assessable for poll taxes offering to pay such taxes for the two years preceding the date of any decree entered in this case. With respect to that prayer, the following colloquy between the District Court and counsel for appellant occurred on December 13, 1961, upon the hearing of defendants' motions to strike:

"The Court: Let me ask you this, Mr. Doar, I notice in the prayer of your complaint, among other things, you asked the Court to in effect permit the payment of back poll taxes for years that are now passed.

"Mr. Doar: That is true, Your Honor.

"The Court: It occurs to me that if you are sound in your positions that the Court would have such authority that there can't be too much urgency about hearing the matter.

"If, for example, the Court has the authority to do that, the Court would have authority after February 1st of 1962 to order the Sheriff to accept the payment of poll tax as if it were paid before February 1, 1962.

"You feel that the Court does have that authority?

5. "§ 9919.5. Poll tax payers to present names, etc.—time for payment.—
  "(1) The tax assessor of the county shall not list the names of persons liable for poll tax on the personal roll of the county, but all persons liable for a poll tax under the constitution and laws of this State shall present their correct names with their age, sex, place of residence, election precinct, and any other informa-

tion which may be lawfully required by the sheriff to the sheriff of the county where they reside each year and pay the poll tax on or before February first. The sheriff shall issue a receipt for each poll tax collected and make all reports for the distribution of the same to the proper officers as provided by law.
  "(2) All laws or parts of laws in conflict to this act will be hereby repealed."

"Mr. Doar: I feel that the Court does have that authority, Your Honor, but on the other hand—

"The Court: Well, if the Court—assuming that you are correct for the sake of dealing with the matter that's here at this time, assuming that you are correct in that regard, doesn't it take it out of the urgent category?

"Mr. Doar: I think not, Your Honor. I think not, because—

"The Court: If, for example, in March or April, speculatively considering the matter, if in effect I could then order the acceptance of poll tax payments which were due before February 1, 1962, and to accept poll tax payments which were due before February 1st of 1961, that would absolutely take it out of the urgent category, wouldn't it?

"Mr. Doar: It would, Your Honor, but in my opinion to take it out of the urgent category as far as the Government was concerned would be for us to have a ruling from the Court of last resort or from a District Court or from the Circuit Court of Appeals that this Court could in fact do that.

"We think that the Court could do it, but it has never been decided, and we can't put the Government, the Government doesn't want to be put in the position, Your Honor—

"The Court: Of putting all your eggs in one basket?

"Mr. Doar: That's correct."

It so happens, that subsequent to that colloquy, and on June 1, 1962, this Court handed down its opinion in State of Alabama v. United States, 304 F.2d 583, enunciating the very broad equitable powers a District Court has to issue appropriate mandatory injunctions in order to grant full and complete equitable relief in cases of this character, and specifically upholding the specific and detailed relief granted by the trial court in that case. In view of our holding in State of Alabama and in view of the fact that we are presently reviewing only the rulings and decision of the trial court with respect to an application for preliminary injunction, we think it would be premature for us at this time to indicate specifically what relief the trial court should grant in his final decree to be entered in this case. The scope, nature, and extent of the specific relief to be then granted is a question which should present itself in the first instance to the trial court and be determined by him upon the full and final hearing for permanent injunction in the light of the evidence then adduced, and should, of course, be determined by him in the light of the trial court's very broad and effective powers and judicial tools for granting full and adequate relief in a case of this kind, as was recognized by this Court in State of Alabama.

Accordingly, the judgment of the District Court denying the motion for preliminary injunction is hereby RE-VERSED. The District Court was in error in concluding that no emergency existed such as would warrant the issuance of a preliminary injunction. His order was entered January 19, 1962. The statutory date of February 1st, 1962 for paying poll taxes was then about to be reached. Now, the date of February 1st, 1963 is about to be reached. To avoid further unnecessary delay the mandate of this Court shall issue immediately with instructions to the District Court to issue the preliminary injunction as sought immediately.

Reversed and remanded.