UNITED STATES of America,
Appellant,

v.

A. L. RAMSEY, Circuit Court Clerk and
Registrar, Clarke County, Mississippi,
and State of Mississippi, Appellees.

No. 20596.

United States Court of Appeals
Fifth Circuit.

Feb. 20, 1964.

On Rehearing April 23, 1964.

On Petition for Rehearing

Harold H. Greene, Gerald P. Choppin, David Rubin, Attys., Dept. of Justice, Washington, D. C., Robert E. Hauberg, U. S. Atty., Jackson, Miss., Burke Marshall, Asst. Atty. Gen., John Doar, Atty., Dept. of Justice, Washington, D. C., for appellant.

Tally D. Riddell, Quitman, Miss., William A. Allain, Asst. Atty. Gen., of Miss., Peter M. Stockett, Jr., Sp. Asst. Atty. Gen., Guy N. Rogers, Asst. Atty. Gen., Joe T. Patterson, Atty. Gen., Jackson, Miss., for appellees.

Before RIVES and CAMERON, Circuit Judges, and HUNTER, District Judge.

HUNTER, District Judge:

In July of 1961 the Attorney General of the United States filed a complaint in the District Court for the Southern District of Mississippi against A. L. Ramsey, Circuit Court Clerk and Registrar, Clarke County, Mississippi, and the State of Mississippi, under the Civil Rights Act of 1957 and 1960 (42 U.S.C.A. § 1971 et seq.). The complaint alleges that defendants, in conducting registration for voting, have engaged in certain racially discriminatory acts and practices which deprived Negro citizens of Clarke County of the right to register to vote; that these deprivations were pursuant to a pattern and practice, and that unless restrained, defendants will continue to engage in such acts and practices. The prayer is for:

A. A finding of a pattern and practice and the issuance of an injunction ordering defendants to refrain from:

(1) Engaging in any act which would deprive any citizen in Clarke County of the right to vote on account of his race or color;

(2) Engaging in any act which would delay, prevent, hinder or discourage qualified Negro citizens, on account of their race or color, from applying for, and becoming, registered voters;

(3) Failing to register any Negro applicant who possesses the same or similar qualifications of the least qualified white person who has been registered.

After a long, hard, and well fought trial, the District Court made specific findings of fact and conclusions of law and entered its decree, which:

1. Dismissed the complaint against Mississippi;

2. Found that Negro citizens had been discriminated against by the Registrar, but that this discrimination did not form a pattern or practice of discrimination within the meaning and contemplation of 42 U.S.C.A. 1971(e);

3. Granted to the United States injunctive relief against the County Registrar, A. L. Ramsey, enjoining and restraining him from engaging in any act or practices which would deprive any citizen in Clarke County of the right to vote on account of his race or color. The injunction was detailed.[1]

It is fair and accurate to say that in substance what the District Court ordered was full and non-discriminatory compliance with the law of Mississippi. No finding of any unconstitutionality of any Mississippi constitutional or statutory provision is sought by the United States.[2] However, the United States appealed, assigning three specific errors:

(1) The District Court erred in dismissing the amended complaint as to the State of Mississippi.

(2) The District Court erred in refusing to find that the discrimination found to have been committed constituted a pattern or practice of discrimination.

(3) The District Court erred in not granting the complete relief sought by appellant as outlined in appellant's proposed decree.

■ The initial error assigned is the District Court's dismissal of the State of Mississippi as a party. Under our holding in United States v. Atkins, 5 Cir., 323 F.2d 733, 739, we do not think that it was improper to eliminate the State as a party. There, we referred to 42 U.S.C.A. § 1971(c), as amended by the Civil Rights Act of 1960, § 601(b), and to the case of United States v. Alabama, 1960, 362 U.S. 602, 80 S.Ct. 924, 4 L. E.2d 982, and stated:

"In that case, the Supreme Court intimated no views upon 'any defenses, constitutional or otherwise, that may be asserted by the State.' We follow the same course in the present case."

Inasmuch as full and complete relief can be afforded here without enjoining the State, we hold that the court below was correct in its dismissal of the State as a party.

Some discussion was had between the parties in the argument of this case concerning the application of the freezing principle. As shown in the Atkins decision, this Court has had the principle under discussion, but has not been faced with a case which required a decision on the subject. Under the facts here, we think that adequate and proper relief is provided by the judgment of the court below, as hereinafter modified, and we pretermit further discussion of the principle.

And the same is true of the appellant's contention with respect to pattern and practice.

■ Defendant vigorously challenges the finding of discrimination. In the face of testimony which witness by witness convicts Ramsey of palpable discrimination, the District Court was certainly correct in its finding of discrimination. The Government argues strenuously that the lower court erred in not finding a pattern of discrimination. Assuming that the District Judge would have been justified in finding the existence of a "pattern or practice of discrimination," we pretermit any definitive action on this facet of the case because we feel it was within the District Judge's discretion to omit action on that phase of the complaint (United States v. Raines, D.C., 203 F.Supp. 147 (1961)). It is apparent to us that the District Judge has obviously made an intelligent and sincere effort to guarantee to all persons in Clarke County, regardless of race, a full opportunity to register and vote without discrimination. He has granted a sweeping injunction against discrimination. The relief granted appears to be carefully designed to provide to Negro citizens of Clarke County the greatest pro-

---

1. See Appendix A.

2. The Mississippi constitutional and statutory provisions relating to the registra-

tion of voters is set forth in Appendix B attached hereto.

·tection and safeguard of their right to register and vote, while maintaining, 'as far as is consistent with the requirements ·of the Fourteenth and Fifteenth Amendments, the delicate balance between State and Federal relations. Registration is a State function; it can best be carried out by the appropriate State officials. But, if one man's rights are denied, the rights of all are endangered. In our country the courts have a most important obligation to protect the rights of all and to do it as harmoniously as possible. In his endeavor to do just this, the District Judge obviously thought it best not to make a specific finding that there was a "pattern." We do not believe that by the language of subsection (e) of 42 U.S.C.A. § 1971 the Congress of the United States intended to impose upon the district courts the mandatory duty of making a finding as to whether a previously found deprivation of rights or privileges was or is pursuant to a pattern or practice, regardless of the District Court's opinion as to the necessity or non-necessity of making such a finding. A federal district court is a court of equity, and as such has broad powers of discretion. Judge Cox heard the evidence; he knows the circumstances; he is the appropriate person to decide what orders are proper and necessary. Discretion is a fundamental attribute of equity. "Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs." This language is quoted from the decision of the Supreme Court in Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083. What the Supreme Court said there dealing with the question of segregation in the public schools is equally applicable here. And cf. United States v. Raines, D.C., 203 F.Supp. 147, ·citing Hecht Company v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754.

Within the last few days, the Supreme Court has granted its specific approval to the choice by the District Judge of the remedy he will select in carrying out his injunctive order. The District Court of the United States for the Southern District of Mississippi had [3] declared the rights of the Negro plaintiffs, but declined to issue an injunction, using in part this language:

"I am further of the opinion that during this period of turmoil the time now has arrived when the judiciary should not issue injunctions perfunctorily, but should place trust in men of high character that they will obey the mandate of the Court without an injunction hanging over their heads. Neither the facts in the present case nor the exigencies of the situation are sufficient or urgent enough to require the granting of an injunction." (206 F.Supp. page 543).

The Court of Appeals for the Fifth Circuit affirmed the action of the District Court, 313 F.2d 637. The Supreme Court [4] denied certiorari, thus leaving in effect this Court's holding that the discretion of the District Court was correctly used in declaring the rights of the plaintiffs, but declining to issue an injunction.

So here, the District Court has granted substantial relief to the plaintiffs, and the relief so granted was, in his opinion, sufficient under the circumstances to guarantee to all persons in Clarke County, regardless of race or color, a full opportunity to register and vote without discrimination. Both the State's rights and the rights of the United States were safeguarded. The rightful authority of the United States was vindicated and the District Judge, familiar with the facts, selected the method of enforcement which he thought was most appropriate. If good faith non-discriminatory registration is not provided, the remedy will be to reopen the case so that the District Judge may grant whatever further relief the facts may justify. The case will remain on the docket of the District Court

3. Clark et al. v. Thompson, Mayor, City of Jackson, et al., 1962, 206 F.Supp. 539.

4. 375 U.S. 951, 84 S.Ct. 440, 11 L.Ed.2d 312.

and that Court will retain jurisdiction of the entire matter for the purpose of making any and all additional findings and conclusions and of entering any and all additional orders as may, in his opinion, be necessary or appropriate.

## DID THE DISTRICT COURT ERR IN NOT GRANTING THE COMPLETE RELIEF SOUGHT BY THE GOVERNMENT?

█ Registration is a prerequisite to voting in Mississippi. Registration is permanent.[5] The United States asks that we reverse the District Judge and order him to enter a mandate setting forth certain specific requirements to enable a man to register in Mississippi; then the Government requests that the mandate be amplified by spelling out for the Registrar just what standards he must apply. Admittedly, this would force the Registrar to violate the law of his State.

Under Mississippi law (Mississippi Code, §§ 3113 and 3239) the Commissioners of election of each county have the duty to erase the names of all persons erroneously registered. These commissioners also have the mandatory duty (Mississippi Code, § 3226) to correct all illegal or improper registrations. Any elector has the right to appeal from any decision of the commissioners in failing to correct illegal or improper registration (Mississippi Code, § 3228).

The aim of equity is to adapt judicial power to the needs of the situation. The District Judge's opinion that this matter could best be handled in the manner he has handled it is proven by the record, which is encouraging, to say the least.

Since the rendition of the District Court's decision of February 5, 1963, the affidavits show that:

(1) Ramsey has not committed any acts of discrimination.

(2) The members of the Clarke County Election Commission have examined the testimony in this case with the view of ascertaining whether or not any of those who testified were illegally registered, and thereafter removed from the poll books the names of at least 24 white voters whose testimony upon examination reflected that they had either been illegally or improperly registered.

(3) Since January 1, 1963 up to and including November 3, 1963, the Registrar had received written applications to vote in Clarke County from 246 persons; that of this number, 183 white persons made application for registration and 63 Negroes made application for registration. Nine of the white people have failed to be registered and 174 white people were registered. Of the 63 Negroes applying for registration, 42 have been registered and 21 have not been registered. Of this number, 16 did not sign nor complete same; one was failed because the application was illegible.

Despite evident shortcomings in the past, we have no reason to believe that the Registrar is not making a good faith attempt to register voters without conscious race discrimination just as he was ordered to do. We feel the people of Clarke County will see that this matter is handled harmoniously and without discrimination. Mississippi law provides adequate remedies for the purging of these improperly registered voters, and a proper reinvigoration of state responsibility it is hoped will make unnecessary any further incursion of federal authority into Clarke County.

It is only when a State shirks its responsibility that the federal government enters the picture. The paramount interest of this fabulous country of ours requires that both our State and National governments be permitted, without unnecessary interference on either side, to exercise all powers that are legitimately theirs. The rights of each must be mutually respected. This is essential to the preservation of our freedoms and the per-

---

5. The qualifications of voters are set forth in the Mississippi Constitution and implementing statutes which appear in Appendix "B" hereto.

petuity of our system of government (which has given to each American a broader and fuller freedom than anywhere on earth). Here, the Registrar discriminated. The National Government intervened, and its position was fully vindicated by the District Judge, but in vindicating that position he very discreetly did not permit his zeal to needlessly supplant local responsibility.

The judgment of the District Court is amended by enjoining not only the present Registrar, but also his successors in office. Then, too, to insure proper compliance and allay the Government's fears, Ramsey and his successors are directed to file monthly reports with the Clerk of the District Court, reflecting the name, address and race of each applicant for registration, the disposition of each application, and if rejected, the reason therefor.

The District Court shall retain jurisdiction of this cause for purposes here enumerated and for the purpose of issuing any and all additional orders that may, in its judgment, become necessary or appropriate for the purpose of modifying and/or enforcing its decree.

As amended, affirmed.

## APPENDIX A

The District Judge granted injunctive relief against the County Registrar, A. L. Ramsey, enjoining and restraining him from:

(a) "Registering illiterate citizens to vote or allowing any citizens who cannot read and write to register or re-register to vote in Clarke County, Mississippi, or to be placed on the registration books of the county by any one else (not his deputy) while he holds such office;

(b) "Neglecting, delaying, failing or refusing to give the statutory test to adult citizens of the county who are otherwise qualified and appear at his office, or other designated place, and apply for registration to vote in the county; and the county registrar (Ramsey) is ordered and directed to make the test of each applicant promptly as required by H.B. 900 Mississippi Laws 1962 and to process such applications, pass on them and grade them by the same standards and in the same way for all citizens of the county of both races exactly alike;

(c) Delaying in deciding whether or not the application in each case has justly and properly passed such test by approved standards and requirements of state law; and defendant (Ramsey) is ordered and directed to communicate the result of such test to the applicant upon his inquiry as provided by H.B. 903 Mississippi Laws 1962 in every case without distinction or discrimination in any manner or to any extent as to race or color;

(d) Discouraging, deterring, preventing or delaying any otherwise qualified citizen of Clarke County from registering to vote; and defendant (Ramsey) is ordered and directed to accord every Negro applicant (otherwise qualified) the same courtesy, assistance and facility which he accords any white applicant who appears for registration or re-registration as a voter in that county;

(e) Registering or re-registering, or allowing any person or citizen to register or re-register who does not personally appear before the registrar or a duly appointed qualified deputy, and personally sign the registration book and statutory oath, or personally request the registrar to sign for him or her according to law and not otherwise, as provided by H.B. 900, supra;

(f) That the defendant, A. L. Ramsey, as county registrar of Clarke County, Mississippi, is ordered and directed to select and keep in such use a number of sections of the Mississippi Constitution which he deems fair, reasonable and proper for use in testing all such applicants during his term, and he shall write the number of such selected sections on separate slips of paper which he shall deposit and keep in a container therefor; and each applicant shall not be allowed to see what section number he is drawing from such container but he shall be permitted to blindly draw one such section number from said container and said section of

the Mississippi Constitution thus drawn by the applicant shall be used by the registrar in administering the test to said applicant; and the registrar is enjoined and directed to fairly and properly and impartially administer such test and to judge the result thereof by the same standard for all such applicants alike without distinction or discrimination as to race or color.

## APPENDIX B

MISSISSIPPI CODE

Section 3113. Commissioners to revise registration and poll books.

On the third Monday of July prior to any regular election, and five days before any other election, the commissioners of election shall meet at the office of the registrar and carefully revise the registration books and the poll books of the several election districts, and shall erase therefrom the names of all persons erroneously thereon, or who have died, removed or become disqualified as electors for any cause; and shall register the names of all persons who have duly applied to be registered, and have been illegally denied registration; and no name shall be permitted to remain on the poll books except such as are duly qualified to vote in the regular election. No person shall vote at such primary whose name is not on the poll book. At the meeting held under this section, the commissioners shall exercise all the functions authorized under the chapter on Registration and Elections and at the October meeting shall only attend to what has since occurred in the way of disqualification or death of electors, or what was before overlooked.

Section 3224. Appeal by person denied registration.

Any person denied the right to register as a voter may appeal from the decision of the registrar to the board of election commissioners by filing with the registrar on the same day of such denial or within five days thereafter, a written application for appeal.

Section 3225. Appeal by other than person denied.

Any elector of the county may likewise appeal from the decision of the registrar allowing any other person to be registered as a voter; but before the same can be heard, the party appealing shall give notice to the person whose registration is appealed from, in writing, stating the grounds of the appeal; which notice shall be served by the sheriff or a constable, as process in other courts is required to be served; and the officer may demand and receive for such service, from the person requesting the same, the sum of one dollar.

Section 3226. Meetings of commissioners to hear appeals.

The board of commissioners shall meet at the courthouse of their county on the first Monday in October after appointment, and shall remain in session from day to day, so long as business may require. Two commissioners shall constitute a quorum to do business; but the concurrence of at least two commissioners shall be necessary in all cases for the rendition of a decision. The commissioners shall hear and determine all appeals from the decisions of the registrar of their county, allowing or refusing the applications of electors to be registered; and they shall correct illegal or improper registrations, and shall secure the elective franchise, as effected by registration, to those who may be illegally or improperly denied the same.

Section 3227. Appeal heard de novo.

All cases on appeals shall be heard by the boards of election commissioners de novo, and oral evidence may be heard by them; and they are authorized to administer oaths to witnesses before them; and they have power to subpoena witnesses, and to compel their attendance; to send for persons and papers; to require the sheriff and constables to attend them and to execute their process. The decisions of the commissioners in all cases shall be final as to questions of fact, but as to matters of law they may be revised by the circuit and Supreme Courts. The

registrar shall obey the orders of the commissioners in directing a person to be registered, or a name to be stricken from the registration books.

Section 3232. Form of poll book.

The poll book of each election district shall have printed or written at the top of each page words to designate the election district for which it is to be used, and shall be ruled in appropriate columns, with printed or written headings, as follows: Date of registration; name of electors; age; color; and a number of blank columns for the dates of elections. All who register within four months before any regular election shall be entered on the poll books immediately after such election, and not before, so that the poll books will show only the names of those qualified to vote at such election. When election commissioners determine that any elector is disqualified from voting, by reason of being delinquent for poll tax, removal from the precinct, or other cause, that fact shall be noted on the registration book and his name shall be erased from the poll book. After disqualification for delinquency has been removed in subsequent years, the name of such elector shall be reinstated on the poll book without re-registration, and that fact shall be noted in the registration book.

Section 3228. Appeal from the decision of the commissioners.

Any elector aggrieved by the decision of the commissioners, shall have the right to file a bill of exceptions thereto, to be approved and signed by the commissioners, embodying the evidence in the case and the findings of the commissioners, within two days after the rendition of the decision, and may thereupon appeal to the circuit court upon the execution of a bond, with two or more sufficient sureties to be approved by the commissioners, in the sum of one hundred dollars, payable to the state, and conditioned to pay all costs in case the appeal shall r t be successfully prosecuted; and in case the decision of the commissioners be affirmed, judgment shall be entered on the bond for all costs.

Section 3239. Commissioners to revise registration books.

On the first Monday of October preceding a general election and five days before any other, the commissioners of election shall meet at the office of the registrar and carefully revise the registration books and the poll books of the several election districts, and shall erase therefrom the names of all persons erroneously thereon, or who have died, removed, or become disqualified as electors from any cause; and shall register the names of all persons who have duly applied to be registered and have been illegally denied registration.

Section 3240. Commissioners to revise registration books.

On the Tuesday after the third Monday in March 1939 A.D. and every year thereafter the commissioners of election shall meet at the office of the registrar and carefully revise the registration books and poll books of the several election districts and shall erase therefrom the names of all persons erroneously thereon, or who have died, removed or become disqualified as electors for any cause; and shall register the names of all persons who have duly applied to be registered and have been illegally denied registration; and no name shall be permitted to remain on the poll books except such as are fully qualified electors.

For the necessary time spent in the revision of the registration books and poll books as provided in section 1 hereof (first paragraph hereof), the commissioner of election shall be entitled to draw the sum of $5.00 per day, to be paid from the general fund of the county.

Section 3226.5. Hearing of appeals at other meetings.

The commissioners of election of each county shall, at the meetings provided for by Sections 3113, 3239 and 3240 of the Mississippi Code of 1942, hear and determine any appeals which may have been perfected and which are pending on the respective dates provided for in said Sections 3113, 3239 and 3240, from the decisions of the registrar of their county al-

lowing or refusing the applications of persons to be registered. The above date for hearing said appeals is supplemental to the provisions of Section 3226 of said Code.

## MISSISSIPPI CONSTITUTION

Mississippi Constitution, section 241 provides:

Every inhabitant of this state, except idiots, insane persons and Indians not taxed, who is a citizen of the United States of America, twenty-one years old and upwards, who has resided in this state for two years, and one year in the election district, or in the incorporated city or town in which he offers to vote, and who is duly registered as provided in this article, and who has never been convicted of bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement or bigamy, and who has paid on or before the first day of February of the year in which he shall offer to vote, all poll taxes which may have been legally required of him, and which he has had an opportunity to pay according to law for the two preceding years, and who shall produce to the officers holding the election satisfactory evidence that he has paid such taxes, is declared to be a qualified elector; but any minister of the gospel in charge of an organized church, or his wife legally residing with him, shall be entitled to vote after six months' residence in the election district, incorporated city or town, if otherwise qualified.

Mississippi Constitution, section 241–A provides:

In addition to all other qualifications required of a person to be entitled to register for the purpose of becoming a qualified elector, such person shall be of good moral character.

The Legislature shall have the power to enforce the provisions of this section by appropriate legislation.

Mississippi Constitution, section 244 provides:

Every elector shall, in addition to the foregoing qualifications be able to read and write any section of the Constitution of this State and give a reasonable interpretation thereof to the county registrar. He shall demonstrate to the county registrar a reasonable understanding of the duties and obligations of citizenship under a constitutional form of government.

The person applying to register shall make a sworn, written application for registration on a form to be prescribed by the state board of election commissioners, exhibiting therein the essential facts and qualifications necessary to show that he is entitled to register and vote, said application to be entirely written, dated and signed by the applicant in the presence of the county registrar, without assistance or suggestion from any person or memorandum whatever; provided, however, that if the applicant is unable to write his application by reason of physical disability, the same, upon his oath of such disability, shall be written at his unassisted dictation by the county registrar.

Any new additional qualifications herein imposed shall not be required of any person who was a duly registered and qualified elector of this state prior to January 1, 1954.

The Legislature shall have the power to enforce the provisions of this section by appropriate legislation.

Mississippi Constitution, section 249 provides:

No one shall be allowed to vote for members of the legislature or other officers who has not been duly registered under the Constitution and laws of this state, by an officer of this state, legally authorized to register the voters thereof. And registration under the Constitution and laws of this state by the proper officers of this state is hereby declared to be an essential and necessary qualification to vote at any and all elections.

Mississippi Code, section 3204 provides:

There shall be a state board of election commissioners, to consist of the governor, the secretary of state, and the attorney-general, any two of whom may perform

the duties required of the board; a board of election commissioners in each county, to consist of three discreet persons who are freeholders and electors in the county in which they are to act, and who shall not all be of the same political party, if such men of different political parties can be conveniently had in the county; and a registrar in each county who shall be the clerk of the circuit court, unless he shall be shown to be an improper person, to register the names of the electors therein.

Mississippi Code, section 3206, provides:

The state board of election commissioners, on or before the fifteenth day of February succeeding each general election, shall appoint in the several counties registrars of elections, who shall hold office for four years and until their successors shall be duly qualified. And the registrar is empowered to appoint a deputy registrar, with the consent of the board of election commissioners, who may discharge the duties of the registrar.

Mississippi Code, section 3213 (1962 Supp.), provides:

A person shall not be registered unless he be able to read and write any section of the constitution of this state and give a reasonable interpretation thereof to the county registrar. He shall demonstrate to the county registrar a reasonable understanding of the duties and obligations of citizenship under a constitutional form of government; he shall also demonstrate to the county registrar that he is a person of good moral character.

The person applying to register shall make a sworn, written application for registration on a form prescribed by the state board of election commissioners, exhibiting therein the essential facts and qualifications necessary to show that he is entitled to register and vote, said application to be entirely written, dated and signed by the applicant in the presence of the county registrar, without assistance or suggestion from any person or memorandum whatever; provided, however, that if the applicant is unable to write his application by reason of physi-cal disability, the same, upon his oath of such disability, shall be written at his unassisted dictation by the county registrar. As originally enacted each provision is and it is further declared to be mandatory and not directory; no application should have been and shall not be approved or the applicant declared qualified to register to vote unless all blank spaces in the application and the oath are properly and responsively filled out by the applicant; and the oath, as such, shall be signed by the applicant; and the application, as such, shall be signed separately by the applicant at the places thereon provided for applicant's signature.

Provided, however, the provisions herein imposed shall not be required of any person who was a duly registered and qualified elector of this state prior to January 1, 1954; except that from and after the effective date of this act no person shall be permitted to register unless he demonstrates to the county registrar that he is of good moral character as required by the provisions of Section 241–A of the Constitution of Mississippi.

RIVES, Circuit Judge (concurring in part and dissenting in part):

To the extent that the majority holds that it was not error for the district court to dismiss the amended complaint as to the State of Mississippi, I concur. I also agree that the judgment should be amended so as to extend the injunction to the successors in office and to require the filing of monthly reports. However, with all deference, I must dissent on the issues relating to the failure to find that the discrimination was pursuant to a pattern or practice and to the refusal to grant relief based on freezing.

This case reveals gross and flagrant denials of the rights of Negro citizens to vote. The defendant registrar took office in 1953. At the time of trial there were approximately 6000 voting age whites and approximately 3000 voting age Negroes in Clarke County, Mississippi. Of these, approximately 5000 whites and only 3 Negroes were registered to vote.

The district court found [1] that around 1500 such registrations involved the illegal registration of unqualified persons or persons who did not take the trouble to go to the registrar's office.[2] The court found that "substantially all" of these instances involved white citizens. The names of five Negroes were added to the rolls without their knowledge, but admittedly for the purpose of avoiding an all-white jury in the trial of a Negro for murder—some of these names were later stricken. Although less than a dozen different Negroes had tried to register since defendant had been in office, the court stated that defendant told eight of them in each instance to go home and think it over in light of existing racial problems in other parts of the country.[3] The court observed: "The inescapable effect of what he said and did on such occasions was to deny those negro citizens of their right to be examined for registration and it cannot be otherwise regarded." The court went on to note that the only three Negroes who were registered [4] were required to take the statutory test and had to wait several days before being advised of having passed. On the other hand, not all whites had to take the test, and whites were not required to wait. Although white citizens were allowed to register for other members of their family who were not even present, the wife of a 76-year-old Negro who was not physically able to sign his name was not allowed to register for him, nor did the defendant registrar furnish to one physically disabled the assistance required by the Mississippi Constitution, section 244.

The district court concluded:

"The Court finds as a fact from the evidence that negro citizens, however, have been discriminated against by the registrar in not according such citizens the statutory right to take such tests to determine whether or not they possess the qualifications to entitle them to register to vote * * *. He did deliberately and improperly deny adult negro citizens who were residents of the county the right to take the legal test for registration. He did nothing to encourage or aid or assist negroes in registration as he did white people * * *."

Despite these findings of discrimination the district court specifically held that "no pattern or practice of discrimination based on race is shown to exist in this case but such deviations from the law were practiced among both races * * *. [N]o pattern or practice of the registrar in such respect [failing to assist Negroes as he did whites] is established by the evidence in this record within the purview of the act." [5]

In the face of all this, the majority opinion affirms because "we feel it was within the District Judge's discretion to *omit* action on that phase of the complaint (United States v. Raines, D.C., 203 F.Supp. 147 (1961)). * * * [T]he District Judge obviously thought it best

---

1. The opinion is reported at 8 Race Rel. L.Rep. 150.

2. The court theorized that in some cases the candidates for office may have been responsible for the appearance of the names. In Mississippi, the registrar of voters is an elected office.

3. There is evidence to the effect that he later told a group of Negroes that it had been decided not to let Negroes register to vote. Most of the Negroes who tried to register did so on more than one occasion. The fact that more did not attempt to register might be explained by the fact that the discrimination against those who did try probably discouraged others from trying. See United States v. Manning, W.D.La.1963, 215 F.Supp. 272, 288 (three-judge court).

This is not counting those whose names were added for the purpose of the murder trial.

5. In addition to these statements quoted from the "Finding of Facts and Conclusion of Law," the "Judgment" of the court expressly ruled: "no pattern or practice of said registrar within the purview of the Civil Rights Act is shown to exist in this case." The order stated: "the plaintiff is entitled in equity only to the relief herein expressly granted against the county registrar and all relief not expressly granted is expressly denied * * *."

*not to make a specific finding* that there was a 'pattern.' We do not believe that by the language of subsection (e) of 42 U.S.C.A. § 1971 the Congress of the United States intended to impose upon the district courts the mandatory duty of making a finding as to whether a previously found deprivation of rights or privileges was or is pursuant to a pattern or practice, regardless of the District Court's opinion as to the necessity or non-necessity of making such a finding." (Emphasis added.) Since the district court in the instant case clearly held that no pattern or practice existed,[6] the majority opinion is apparently holding that it was an abuse of the district judge's discretion to make any ruling at all— despite the majority's eloquent plea for broad powers of discretion.[7]

In addition to the majority's paradoxical treatment of the district court's finding of no pattern or practice, I am convinced that there is a mandatory duty on the district court to make some finding as to pattern or practice and that United States v. Raines, supra, was incorrectly decided. It is clear that discretion must give way when there is a specific statutory mandate. Subsection (e) of 42 U.S.C.A. § 1971 provides in no uncertain terms that: " * * * the court *shall* upon request of the Attorney General and after each party has been given notice and the opportunity to be heard *make a finding whether such deprivation was or is pursuant to a pattern or practice.*" (Emphasis added.)

The word "shall" when used in a statute is usually mandatory, the language of

command, unless the legislative history and the policy of the act indicate otherwise. See Escoe v. Zerbst, 1935, 295 U. S. 490, 493–494, 55 S.Ct. 818, 79 L.Ed. 1566; Peoples Securities Co. v. SEC, 5 Cir. 1961, 289 F.2d 268, 274. Legislative history and policy considerations uniformly indicate that "shall" was used in this subsection in the mandatory sense.[8] It was intended by Congress that a finding of a pattern or practice of discrimination would have two effects: (1) it would serve as a conclusive presumption of discrimination in later applications to the court for qualification to vote, and (2) it would allow the court, should the judge so choose, to make use of the voting referee procedure.[9] Deputy Attorney General Walsh stated to the Senate Judiciary Committee that under this section the court, upon request, "*must* make a finding as to whether the discrimination was pursuant to a pattern or practice."[10] Similarly, Representative Willis, on the floor of the House, observed: "[W]hen an injunction suit is filed and an injunction decree is issued, the judge, upon application of the Attorney General, *must* make a finding as to whether or not the alleged discrimination is pursuant to a pattern or practice."[11] The Report of the Senate Committee on the Judiciary makes quite clear the mandatory nature of the finding: "Under the revised referee plan as contained in H.R. 8601 the court would, upon request of the Attorney General in cases brought to enforce voting rights guaranteed by the 15th amendment, be *obligated* to make a supplemental finding as to whether the vot-

---

6. See note 5, supra, and accompanying text. In the Raines case, relied on by the majority, there was no such ruling on the existence of a pattern or practice.

7. Surely the majority does not mean to suggest that a district judge has discretion to rule that *no* pattern or practice existed, when the facts found by the district court demonstrate that there was such a pattern or practice.

8. Cf. United States v. Wood, 5 Cir. 1961, 295 F.2d 772, 783, holding that "shall" in subsection (d) creates a mandatory duty

on the district courts to exercise jurisdiction of proceedings under 42 U.S.C.A. § 1971. See also United States v. Dogan, 5 Cir. 1963, 314 F.2d 767, 771–772.

9. See generally, 106 Cong.Rec. 5773 (remarks of Representative Celler).

10. Hearings on H.R. 8601 Before the Senate Committee on the Judiciary, 86th Cong.2d Sess. 7–8. (Emphasis added.)

11. 106 Cong.Rec. 5772. (Emphasis added.) See similar comment by Charles J. Bloch, Hearings on H.R. 8601 Before the Senate Committee on the Judiciary, 86th Cong., 2d Sess. 164.

ing deprivations are pursuant to a pattern or practice." [12] (Emphasis by the Committee.) In suggesting that an enrollment officer plan be added to the referee plan already in the bill, the Committee noted that under the enrollment officer plan the court "is not *required* to make a finding that the deprivation of voting rights is done pursuant to a pattern or practice *as would be the case under the court referee proposal.*" [13] (Emphasis added.) Moreover, Senator Eastland, on the floor of the Senate, stated in unmistakable terms:

"Then a new step comes into play: The Attorney General requests that the Court make a finding as to whether a pattern or practice of discrimination exists. *This is mandatory on the Court. He must make such a finding.*" [14] (Emphasis added.)

This clear legislative intent is supplemented by a similar interpretation placed on the subsection by the three-judge district court in United States v. Manning, supra.[15] It is significant that neither the majority opinion in this case nor the opinion in Raines cites any legislative history tending to show a contrary intent.

Moreover, the policy of the subsection favors lack of delay in the processing of applications for qualification and in the use of the voter referee plan.[16] Thus the finding as to pattern or practice was made mandatory not only to bring the presumption of discrimination and the referee plan into play, but also to meet the warning of Senator Hart: "[W]e ought to eliminate, so far as we can, the delays and difficulties in the operation of that device [subsection (e)]." [17] Plaintiffs in civil rights cases, especially voting cases, have already found themselves plagued with unnecessary and unwarranted delays in the trial courts. See the carefully documented Comment, Judicial Performance in the Fifth Circuit, 73 Yale L.J. 90 (1963). Speaking for the Court in United States ex rel. Goldsby v. Harpole, 1959, 263 F.2d 71, 78, 79, I commented:

"We have called the figures startling, but we do not feign surprise because we have long known that there are counties not only in Mississippi, but in the writer's own home State of Alabama, in which Negroes constitute the majority of the residents but take no part in government either as voters or as jurors. Familiarity with such a condition thus prevents shock, but it all the more increases our concern over its existence."

More than five years have elapsed since that decision, but the statement still holds true with improvement only minuscule. Concern over such delays has led to a bill now before Congress which would provide, upon request, three-judge courts in voting cases and which would require the district court "to assign the case for hearing at the earliest practicable date and to cause the case to be in every way expedited." [18] Failure to require a rul-

---

12. S.Rep. No. 1205, 86th Cong., 2d Sess. (1960), 1960 U.S.Code Cong. & Admin. News, pp. 1925, 1927. The Committee's fears of unconstitutionality were unfounded. See United States v. Manning, W.D. La.1963, 215 F.Supp. 272 (three-judge court).

13. S.Rep. No. 1205, supra, n. 12, at 1928–29. The enrollment officer plan did not pass.

14. 106 Cong.Rec. 7438.

15. Supra n. 12, 215 F.Supp. at pp. 290, 294–295 ("it must * * * make a finding * * *"). The court was not disturbed by the congressional limitation

this subsection places on the judge's discretion. See id., 215 F.Supp. at 291.

16. Subsection (e) provides that: "Applications pursuant to this subsection shall be determined expeditiously." 42 U.S.C.A. § 1971(e).

17. 106 Cong.Rec. 7229.

18. H.R. 7152, 88th Cong., 1st Sess., § 101(d). The proponents of the new bill, including Congressman McCulloch, who was the sponsor of the bill which later became the Civil Rights Act of 1960, have expressed their concern: "The testimony before the Judiciary Committee substantiated the fact that certain district

ing on pattern or practice will only add another opportunity for delay.

There can be no doubt that the district judge's finding of no pattern or practice was clearly erroneous. The legislative history of subsection (e) reveals that a pattern or practice exists when the discrimination is not an isolated or accidental or peculiar event, but part of the regular procedure, the usual situation.[19] The number of Negroes actually turned away or discriminated against may be small.[20] Here, the trial court's own findings of discrimination conclusively show that a pattern or practice existed.

I also dissent from the majority's failure to grant relief based on freezing. Freezing results when there have been past discriminatory practices in the registration process, these discriminatory practices are discontinued, but new and more onerous requirements are imposed. While theoretically applicable to all, these new requirements primarily affect those who bore the brunt of previous discriminations and tend to maintain the position of advantage which one class has already obtained over the other. See United States v. Louisiana, E.D.La.1963, 225 F.Supp. 353, at pp. 391–398 (three-judge court); United States v. Atkins, 5 Cir. 1963, 323 F.2d 733, 743–745; cf.,

United States v. Dogan, 5 Cir. 1963, 314 F.2d 767. Prior to this suit approximately 5000 out of 6000 voting age whites had been registered to vote, but only 3 out of approximately 3000 voting age Negroes had been registered. A large number of these whites would not have been able to meet the strict standards for registration required by Mississippi law.[21] Yet the district court required the registrar to apply these standards to most all of the Negro voting-age population and the few whites who were not already registered. (See Appendix A to the majority opinion.) The freezing effect is obvious.

If the district court had found that the discrimination existed pursuant to a pattern or practice, then, in accordance with subsection (e), applications by Negroes subsequently rejected by the registrar would be filed with the district court (or at the court's direction with the voting referee). These applicants would not have to meet qualifications "more stringent than those used by the persons found in the proceeding to have violated subsection (a) of this section in qualifying persons other than those of the race or color against which the pattern or practice of discrimination was found to exist." 42 U.S.C.A. § 1971(e).

court judges have been less than enthusiastic in their enforcement of the 1957 and 1960 acts. Evidence was presented that 2 or more years have elapsed in some cases before a decision could be obtained. Many of these decisions must be considered less than victories. Single judges have in some instances refused to act in the face of convincing evidence. * * *" H.R.Rept. No. 914, 88th Cong., 1st Sess. Pt. 2, at 4 (1963).

19. See Hearings on H.R. 10327 Before the House Committee on the Judiciary, 86th Cong., 2d Sess. 13 (1960) (remarks of Deputy Attorney General Walsh); Hearings on H.R. 8601 Before the Senate Committee on the Judiciary, 86th Cong., 2d Sess. 68, 69 (1960) (remarks of Deputy Attorney General Walsh). Senator Keating made the following explanation to the Senate:

"The 'pattern or practice' requirement means only that the proven discriminatory conduct of the defendants

was not merely an isolated instance of racial discrimination. For example, a challenging system which operated to strike Negroes from the voting rolls while leaving enrolled white persons who were equally subject to challenge would constitute a pattern or practice of discrimination. *Similarly, if State registration officials applied more stringent qualification tests to Negroes than to white citizens, or attempted to frustrate Negro enrollment by failing to hold registration sessession, such derelictions of duty would constitute a pattern or practice. Moreover, a single act such as enactment of a statute directed at Negroes would in itself constitute a pattern or practice of discrimination."* (Emphasis added.) (106 Cong.Rec. 7223.)

20. See 106 Cong.Rec. 5487.

21. Some of these whites were shown to be illiterate.

Thus the district court's order requiring the use of the stricter standards for applications to the registrar than for applications to the court would be neither good judicial husbandry nor compliance with the intent of the statute.[22]

The majority opinion meets the problem of freezing by pointing out that since the time the judgment of the district court was entered the defendant registrar has not discriminated against Negroes and some 24 whites have been removed from the poll books. But the nondiscriminatory use of the stricter standards does not rectify the freezing effect caused by past injustices,[23] and the limited purging is but a meager start to a monumental task. Yet the majority goes on to say:

> "We *feel* the people of Clarke County will see that this matter is handled harmoniously and without discrimination. Mississippi law provides adequate remedies for the purging of these improperly registered voters, and a proper reinvigoration of state responsibility it is *hoped* will make unnecessary any further incursion of federal authority into Clarke County.
>
> "It is only when a State shirks its responsibility that the federal government enters the picture." (Emphasis supplied.)

But the state and its subdivision have shirked their responsibility—the prior violations of both the federal and state constitutions are appalling. The cessation of these discriminatory practices is hardly an indication that a renaissance has taken place, for the registrar was acting under the threat of an injunction and the past discrimination has securely been sealed into permanent existence. The Constitution and the Civil Rights Acts afford citizens far more than barren hopes that some day their right to vote will materialize through the voluntary actions of previously irresponsible officials.

## ON PETITION FOR REHEARING

Before RIVES, Circuit Judge, and HUNTER, District Judge.[*]

### PER CURIAM:

▪ The District Court held that no pattern or practice of discrimination existed. The majority here, in its opinion, held that the District Court had discretion to omit action altogether on this phase of the complaint. Whether so or not, we are now persuaded that when as here the District Court makes such a finding it is our obligation to pass on its correctness.

▪ Was the finding that there was no pattern or practice in the discrimination by the Registrar clearly erroneous? The answer to that question must clearly be "yes." To this extent, our original judgment is modified. In the light of that holding, we are persuaded in this case that the question of further relief should be first ruled on by the District Court. To the extent indicated by this opinion the petition for rehearing is granted and in other particulars it is denied.

As amended and modified, the case is remanded for further proceedings not inconsistent herewith.

22. The most effective remedy for freezing when subsection (e) is not invoked is discussed in United States v. Louisiana, supra 225 F.Supp. at pp. 396–398.

23. See United States v. Louisiana, supra 225 F.Supp. at p. 396.

* Judge CAMERON participated in the original decision but died before the petition for rehearing was decided.