**UNITED STATES of America,**
Appellant,

v.

**Leonard C. DUKE, Circuit Court Clerk and Registrar, Panola County, Mississippi, et al., Appellees.**

No. 20800.

United States Court of Appeals
Fifth Circuit.

May 22, 1964.

Harold H. Greene, Gerald P. Choppin, Attys., Burke Marshall, Asst. Atty. Gen., H. M. Ray, U. S. Atty., John Doar, Atty., Dept. of Justice, Washington, D. C., for appellant.

Peter M. Stockett, Jr., Sp. Asst. Atty. Gen. of Mississippi, William A. Allain, Will S. Wells, Asst. Attys. Gen. of Mississippi, Jackson, Miss., Herbert M. Fant, Sardis, Miss., James McClure, Sr., James McClure, Jr., Sardis, Miss., Robert T. Riser, Batesville, Miss., Joe T. Patterson, Atty. Gen. of Mississippi, for appellees.

Before TUTTLE, Chief Judge, and RIVES and WISDOM, Circuit Judges.

TUTTLE, Chief Judge.

When this suit was filed by the United States on October 16, 1961, Panola County, Mississippi, had 7,639 white persons, and 7,250 Negroes of voting age. At least 5,343 white persons were then registered to vote. The only Negro registered to vote in Panola County was R. H. Hightower, 92 years old, who had registered in 1892. This does not tell the whole story, because another Negro, E. H. Holloway, was registered on January 5, 1952, but he is now deceased. Also, after this suit was filed, and before the trial in the court below, one Houston Potts, Jr., was registered in April, 1962.

Proceeding on the theory that such a situation could exist only because of state action which unconstitutionally interfered with the exercise of the voting franchise by the Negro citizens of Panola County, the United States brought this suit against Duke, Circuit Court Clerk and Registrar of Panola County, and the state of Mississippi.

The complaint alleged that the defendants, in conducting registration for voting, have engaged in certain racially discriminatory acts and practices which deprived Negro citizens of Panola County of the right to register to vote without distinction of race and color; that these deprivations were pursuant to a pattern and practice; and that, unless restrained, appellees will continue to engage in such acts and practices. The prayer was that the trial court make a finding of the existence of a pattern and practice of discrimination and issue an injunction enjoining appellees, their agent, employees and successors from engaging in certain acts and practices.

Considering the registration requirements in Mississippi, there are three periods of substantial significance touching on the issues of this case. The Mississippi Constitution of 1890 requires registration as a prerequisite to voting. Prior to 1955, Section 244 required that an applicant, otherwise qualified, be able to read any section of the Mississippi Constitution, *or* understand it when read to him, *or* give a reasonable interpretation thereof.

To be otherwise qualified, an applicant must (1) have fulfilled the residence qualification; (2) be a citizen not less than 21 years of age (or reach the age 21 before the next election); (3) not have been convicted of any disqualifying crimes enumerated in the Constitution or laws of Mississippi; and (4) not be insane. Payment of poll taxes, while required for voting, is not a prerequisite to registration.

After April 4, 1955, when the State legislature implemented the amendment of Section 244 of the Mississippi Constitution, the following additional requirements for registration became effective: applicants must be able to read and write any Section of the Mississippi Constitution *and* give a reasonable interpretation thereof; they must demonstrate a reasonable understanding of the duties and obligations of citizenship under a constitutional form of government; and they must make sworn written application of registration on a form prescribed by the State Election Commission. These additional requirements applied only to persons registered to vote after January 1, 1954.

In 1960, shortly before the passage of the Civil Rights Act of 1960, the state legislature authorized the destruction of the application forms. Mississippi Code, Section 3209.6, as amended. In addition, a new section (241–A) of the Mississippi Constitution added the requirement that an elector be of good moral character. In 1962, implementing legislation was enacted (Section 3235, Mississippi Code). The legislature also amended Section 3209.6 to require the State Election Commission to include in any application forms which they prepare for the use of the registrars spaces for information showing good moral character (in order that the applicant might demonstrate his good moral character to the registrar). Finally, two additional statutes were passed and became effective in May 1962. One (H.B. 822, Reg.Sess. 1962) provides for the publication of the names of all applicants for two successive weeks, following which a two-week waiting period is required before an applicant may become registered. The second (H.B. 904, Reg.Sess. 1962) provides for a procedure by which qualified electors may challenge the good moral character of an applicant.

Although we have given the requirements down through the enactment of the laws in 1962, the three periods of importance here are the period before 1955, the period between 1955 and 1960, and the period from 1960 until this suit was filed on October 16, 1961. It must be borne in mind that registration is permanent in the state of Mississippi, and, once a citizen's name is on the registration books, he is not required to re-register.

The record before the trial court fully substantiates the contention of the United States that at least until the date of the filing of this suit voting was, for white persons in Panola Coun-

ty, Mississippi, a simple corollary of citizenship. It is equally clear that the exercise of this basic right of citizenship was exclusively enjoyed by the white people of this county. The question presented to the trial court, and preserved for our attention, is whether this condition existed without a course of conduct by the state or local officials which amounted to an illegal interference with the Fifteenth Amendment rights of Negro citizens of Panola County.

■ The trial court, after requiring the United States to file a more definite statement to charge specifically the alleged discriminations with the degree of specificity required under Rule 9(b), Federal Rules of Civil Procedure, dealing with allegations of fraud,[1] proceeded to a hearing of the case on oral testimony. Although in its findings of fact the trial court did not resolve all of the conflicting testimony, it found that between 1932 and 1959 not more than five or six Negroes had applied to register in Panola County, and that one of these had been registered. It found that there was no evidence showing that any particular Negro who had been otherwise qualified had been denied the right to register because of race or color and further that there was no evidence that any Negro had been denied such right because of race or color. It found that there "was no evidence"[2] that Duke or the state of Mississippi or anyone else in Panola County had done anything to intimidate or discourage Negroes from attempting to register. The court doubtless intended to say that it found against such evidence rather than that there was "no evidence."[3] The court found that Duke and his deputies helped white applicants but it found that there was no evidence showing that he refused to help Negroes. The court found that the registration of white people who should not have been registered apparently occurred "largely by inadvertence because of the lack of training of the sometimes inept deputies and without the knowledge or discretion of the defendant Duke." The court found that women deputies always referred Negroes to Duke "as a matter of personal preference by the women." It is undisputed that on each occasion when Negro applicants sought to register, they had to wait for Duke's arrival from some other place if he was not in the office. He was usually at Sardis.[4] The court found that no denial of the rights of Negroes was shown from the fact that whites had been registered who did not meet the standards for registration set by the Mississippi laws. It also found that it was not shown with re-

1. This Court had previously criticized such a requirement at the pleading stage of a similar injunction suit in United States v. Lynd, 5 Cir., 301 F.2d 818, 822, where we said: "Likewise, it is clear that there was no justification for the Court's requiring the government to amend its complaint in this civil rights action to allege specific details of voter discrimination as if this were an action for fraud or mistake under Rule 9, Federal Rules of Civil Procedure." This ruling was confirmed by this Court when the Lynd case came on for final hearing on appeal on the merits at 321 F.2d 26, 27.

2. This finding is clearly erroneous because, over the objection of defendants, the court permitted the Negro witness, Kuykendall, to testify that when he went to the courthouse to register he was told by Deputy Mrs. Draper to wait and that he then heard a conversation described by him as: "Well I could hear them talking in there, the door was partly open and I heard Mrs. Draper ask Mr. Travis [the Sheriff] was he going to bother me in there or wait until I went out," to which Kuykendall testified that Travis replied, "No, wait until he comes out." And further that Mr. Travis said, "If we let them get by with this some of them will be running for Sheriff."

3. Another Negro witness testified that he was hurried and flustered by Duke by the manner in which Duke handled the books and papers while he was attempting to complete the application form.

4. Panola County had two courthouses, one at Batesville and one at Sardis. Mr. Duke resided in Sardis. A permanent woman deputy was regularly present at Batesville.

spect to any of the Negroes who testified that the "lesser and mistaken standards applied to some white people could be met or surpassed by them."

■ Statistical evidence agreed to by the parties showed that there were more than 2,000 Negro residents of Panola County who had received seven or more years of schooling. Although no figures were introduced, we can doubtless take judicial notice of the fact that with approximately 750 Negro residents having had some high school training, there must have been a significant number of high school as well as grade school teachers, principals and other school professional personnel among the Negro race to conduct the public schools of Panola County, under the "separate but equal" school operation that is required under the Mississippi laws.

This Court has said, "In the problem of racial discrimination, statistics often tell much, and Courts listen." State of Alabama v. United States, 5 Cir., 304 F.2d 583, 586. In United States, ex rel. Goldsby v. Harpole 5 Cir., 263 F.2d 71, at page 78, we said:

"We cannot assume that Negroes, the majority class in Carroll County, had en masse, or in any substantial numbers, voluntarily abstained from registering as electors and, by such action, had rendered themselves ineligible for jury duty. If the registration officials freely and fairly registered qualified Negroes as electors, that fact rested more in the knowledge of the State. The burden was on appellee, as the State's representative, to refute the strong prima facie case developed by the appellant. The only Negroes ever proved registered as electors in Carroll County were two who had died before 1954."

Here, the trial court assumed precisely what we said could not be assumed. The court particularly alluded to the fact that only a small number of Negroes had made an effort to register prior to 1959.

Prior to 1955, according to the record before us, white citizens "merely had to sign the book," to be registered voters. However, there was always lurking in the background the constitutional requirements that the registrant be able to interpret a provision of the Constitution. Any Negro citizen optimistic enough to seek the right to participate in governmental affairs would also be smart enough to know that this requirement could be placed as a stumbling block in his path since it would be a subjective test by the registrar upon which his success or failure would be measured. After 1955, the test became even more subjective, in that "the understanding" clause was placed into the questionnaire as a requirement. The form also stated that the applicant must complete it "in his own handwriting * * * and without assistance or suggestion of any other person."

Several years after this law was passed some local interest was aroused by the creation of a Negro Voters League. The first three persons to try to get some information on the subject went to Sardis, the site of one of the courthouses, and asked Mr. Duke what the requirements were for voting. He replied that he couldn't say because he hadn't got the questionnaires yet from Jackson, the state capitol.[5] Duke then told them that should apply at Batesville, the site of the other courthouse, and the proper place according to their residence. Several weeks later they

5. The trial court did not resolve any issue as to whether this actually occurred. However, since in his answer Duke admitted that these persons called on him in Sardis in 1959, we accept as undisputed their version of the affair, even though Duke, when later examined, testified that he "believed" that they came in 1955, at which time he had no questionnaires under the new law. This is entirely inconsistent with the testimony of everyone that the Voters League was not organized until 1959.

tried again and went to the courthouse in Batesville, where the woman deputy told them they would have to wait for Mr. Duke to handle the matter personally. They waited some 25 or 30 minutes and he came over and told them he would take them one at a time, although there was no personal examination involved, only the filling out of a questionnaire. When these and other applicants at about the same time reached that part of the application requiring them to interpret a provision of the Constitution, they were given sections that, so far as this record discloses, were never given to any white applicant. Some of these are Section 212,[6] dealing with the interest rate on the Chickasaw School Fund, Section 228,[7] dealing with alluvial land; Section 266,[8] dealing with restrictions on state office holding, and Section 282,[9] dealing with the validity of recognizances and other obligations entered into before the adoption of the 1890 Constitution.

Although none of the applicants received word from Mr. Duke as to their success or failure, and although the application forms had been destroyed by Duke, prior to the trial, he testified that none of them passed. So, also, did some of the witnesses themselves say they either were not satisfied with their answers or they did not complete the answers.

During the time that these efforts were being made, some ten Negroes applied and none was registered. One testified that he was within a few days of his 21st birthday, and he was told that he could not register until he was 21 years of age; this was denied by Mr. Duke. The court's findings on this matter are inconsistent with both the testimony of the Negro witness and of Mr. Duke. Another Negro would-be registrant testified that he was rejected as a registrant by Mr. Duke because he did not have two poll tax receipts. Duke testified that he had not refused to register him but had suggested to him that he wait until he had paid two years of poll taxes because he would not be permitted to vote in the election unless he had such receipts. Many white persons were registered who had not paid their two years poll taxes.[10]

§ 212.

6. "The rate of interest on the fund known as the 'Chickasaw School Fund,' and other trust funds for educational purposes for which the state is responsible, shall be fixed, and remain as long as said funds are held by the state, at six per centum per annum from and after the close of the fiscal year A. D. 1891; and the distribution of said interest shall be made semi-annually, on the first of May and November of each year."

§ 228.

7. "The division heretofore made by the legislature of the alluvial land of the state into two levee districts—viz., the Yazoo-Mississippi Delta Levee District and the Mississippi Levee District, as shown by the laws creating the same, and the amendments thereto—is hereby recognized, and said districts shall so remain until changed by law; but the legislature may hereafter add to either of said districts any other alluvial land in the state."

§ 266.

8. "No person holding or exercising the rights or powers of any office of honor or profit, either in his own right or as a deputy, or while otherwise acting for or in the name or by the authority of another, under any foreign government, or under the government of the United States, shall hold or exercise in any way the rights and powers of any office of honor or profit under the laws or authority of this state, except notaries, commissioners of deeds, and United States commissioners."

§ 282.

9. "All recognizances, bonds, obligations, and all other instruments entered into or executed before the adoption of this Constitution, to the state of Mississippi, or to any state, county, public or municipal officer or body, shall remain binding and valid, and the rights and liabilities upon the same shall be continued, and may be prosecuted as provided by law.

10. Mississippi law does not require payment of poll taxes before registration, only before voting.

However that may be, testimony by the Negro witnesses was that they then "became discouraged" and that was the end of the Voters League. During the same time, white applicants were still being registered without the necessity either of waiting for Mr. Duke personally to come to register them, of being taken up one at a time, or of answering any questions as to the meaning of a constitutional section more than three lines long. In fact, a number of white witnesses were produced to testify that they did not know the answers to these simple questions or that they were assisted by the registrar or one of his assistants in answering them. It was also demonstrated by application blanks of some white registrants that they were illiterate. Nevertheless they had been registered on the day they applied. It is small wonder that the Voters League members got discouraged and quit trying.

There is other evidence which was not too positive and as to which the trial court made no specific findings of fact, which would certainly warrant a conclusion that the registrar discouraged persons from going through with the registration proceedings. In one instance, a Mrs. Lloyd came to Duke's office and inquired about the requirements for women to vote, and she testified that he responded that she had to take a test on the Constitution of Mississippi and that this involved about 40 questions. Of course, this is not correct. There were only 21 questions in all, including name and address, date of birth, etc., and only one question involved the Mississippi Constitution.

Another instance is that of Willie Kuykendall, which is related above, (Footnote 2) as to which he may well have concluded that the Sheriff was attempting to "discourage" him from coming back to try again. Bearing on this phase of the testimony, it is appropriate to note that the trial court refused to permit the government to adduce evidence by one Negro witness who started to testify as to why he failed to return. He got so far as to mention a county official, whereupon appellee's counsel objected on the grounds that anything said by a county official could not be binding on the named defendants. Government counsel sought to make his record by letting the witness testify as to what conversation it was that caused him to refrain from returning to try to register a second time. He contended it was relevant to show an official policy of the county to deter Negroes from registering to vote. The court declined to permit the record to be completed in this regard, although counsel requested the right to make a proffer of this testimony. Nevertheless, the court, in its findings, stated that not only had the defendant Duke or the state of Mississippi not done anything to intimidate or discourage Negroes, but also that there was no evidence that anything had been done "by anyone in Panola County" along these lines.

The proffered evidence would have been clearly relevant to the issue, which the trial court also considered significant, that only a few Negroes had ever attempted to register, which fact the court said, "refutes completely the implication the plaintiff draws erroneously from statistical data showing the number of qualified voters among the members of the white race in Panola County as compared with the number of qualified voters among the Negro race." If, in fact, a county official, though not a defendant in the suit, intimidated or discouraged Negroes from attempting to register, this fact would be relevant on this very issue.

We must conclude that the trial court used the word "discouraged" entirely too literally either in the sense that the discouragement had to arise from Mr. Duke personally or that discouragement could not consist of an accepted course of conduct participated in by all involved in the registration process.

 The state made no effort to "refute the strong prima facie case" that the registration officials had not "freely and fairly registered qualified Ne-

groes," United States ex rel. Goldsby v. Harpole, supra. The trial court should therefore have determined that until 1955, and for an undetermined later period, Negroes in most rural communities in Mississippi simply were not expected to, and they did not, offer themselves as voters, and they did not seek to register because of this accepted pattern of life in rural Mississippi. As this Court said in the Harpole case, supra, this is not to select Mississippi as being unique in this regard among the states. We there stated, "We have called the figures startling, but we do not feign surprise because we have long known that there are counties not only in Mississippi, but in the writer's own home State of Alabama, in which Negroes constitute the majority of the residents but take no part in government either as voters or as jurors. Familiarity with such a condition thus prevents shock, but it all the more increases our concern over its existence."

The Court then stated what must be done when such a case arises, by saying, "When, in a proper case such as this, there is added to our common knowledge proof that some of the Negro citizens are qualified educationally and by other legal standards but are excluded from serving as jurors solely because of their race or color, the courts must declare the maintenance of such a condition violative of the Constitution and must not tolerate its longer continued existence." 263 F.2d 71, 78.

Commencing, then, with 1955, at which time white people were permitted to register by "merely signing the book" in Panola County, and thousands had registered by that simple process, we arrive at a time when Negroes' interest became aroused in the rights of citizenship, and we find that this awakened interest met with what might be called polite but effective discouragement. For the first time technical provisions of the Mississippi Constitution having little to do in general with the true obligations of the citizen to his state or nation, are put to a Negro applicant who knows from the very nature of the question that he simply cannot answer it to the satisfaction of the registrar. He is also met with the subtle but typical rebuff in the response that the white lady can't wait on him but he must wait for the registrar.[11] The officials and the trial court completely overlooked the fact that the deputies were public officials elected and paid by the county to serve the public and all of its citizens. The trial court here, as did the trial court in the Lynd case, supra, erred in dismissing this fact by a finding that the women deputies referred Negoes to Duke "as a matter of personal preference."

This official conduct was a double discouragement to registration. The first, a subtle one, an expression of distaste or distrust of the public official for the citizen based solely on race and without reference to the personal qualities of the individual concerned, and second by requiring a delay awaiting Mr. Duke's arrival from the other county seat.

When followed by the other undisputed course of conduct in making all but the first one of several Negro applicants await their turn, and thus requiring a delay of up to two or three hours, this record, without more and without reference to the findings of fact made by the trial court demonstrates clearly that there was a pattern and practice in Panola County, which, existing in full vigor in 1955, denied the Negro citizen an opportunity to register, and was carried forward by the different treatment accorded him subsequent to that time.

11. In the Lynd case, 301 F.2d 818, as appears in the transcript and the evidence there, the District Court excused similar action when he professed to be "thoroughly familiar with some of the conduct, with some of our colored gentry," and found it "understandable" that "those girls [the deputy registrars] did not want to be subjected to those things." He there concluded that the registrar "did exactly right in taking those things upon himself."

■ As efforts were subsequently made to overcome these barriers, and indications were that more Negroes would make the effort, the barriers grew successively higher, so that in 1960 the understanding clause was inserted, and in 1962 the good character requirement was added. The United States does not, in this action, attack the constitutionality of any of the requirements for registration *per se*. This attack has been made in another suit as to which a three-judge district court has now found that the provisions of the Constitution are not unconstitutional on their face. United States v. Mississippi (S.D.Miss.) 229 F.Supp. 925, Judge Brown dissenting, prob. juris., noted, 377 U.S. 988, 84 S.Ct. 1920 (1964). While in many respects, this decision by the Mississippi District Court appears to conflict with an earlier decision by the three-judge court in Louisiana, holding somewhat similar statutes unconstitutional, 225 F.Supp. 353, these issues can not be resolved by us. We must assume for the purpose of this case that these requirements are not unconstitutional on their face.

Evidence adduced on the trial below shows that even after the latest of the enactments, the terms of the statute were being disregarded in the registration of white voters. The trial court dismissed these as being errors made by inept, inexperienced deputies, although in point of fact the experience of both regular deputies was about as long as one would normally expect, one having been the chief deputy at Batesville from 1942 to 1959, and the other having been deputy for some time until he was elected to succeed Mr. Duke in 1962. We incline more to the attitude expressed by the trial court while the case was on trial that "he [Duke] is the man responsible for the office, no matter whether he handled it personally or not." If there were any doubt about Duke's responsibility for the lax manner in which the law was applied, ample proof appears from the fact that a white witness, who was registered in May

1962, testified that Duke not only corrected his error in checking the wrong oath, but Duke also told him what interpretation he should write for the constitutional section and what to write as the duties and obligations of citizenship.

In light of the facts that stand without dispute in the record, it is difficult to understand what is meant by the trial court's statement that "it was not even shown, with respect to any of them [the Negro witnesses] that the lesser and mistaken standards applied to some white people could be met or surpassed." The fact is there were *no* standards applied to some white people. It is perfectly apparent from the testimony given by the Negro witnesses, including their reading without error from the witness stand somewhat involved sections of the Constitution, that they could more than meet the "lesser and mistaken standards applied to some white people." They clearly demonstrated they were better qualified than some of the persons registered. A holding or finding to the contrary is clearly erroneous.

If, upon the enactment of the implementing statute in 1955, the registration officials of Panola County had immediately begun treating Negro applicants in precisely the same manner in which they treated white citizens of the county, by either treating the application form as merely an information blank from which the necessary statistical information could be obtained to ascertain age and residence and precinct of the applicant, or as a literacy test (although this was not even applied to all white applicants), and if the processing of Negro applications had been as prompt and as routine as those of white citizens, and, to the extent that any attention at all was paid to the interpretation requirement, the same simple sections of the Constitution were presented to Negro applicants, the defendants would be in a better position to support the action of the trial court in denying a permanent injunction. This is not

what happened. The Negro citizens were not treated in the same manner as the white citizen. The application was treated largely as an information form when submitted by a white person. It was a test of skill for the Negro. It was not even a test of literacy for the white, whereas any Negro applicant demonstrated his literacy in filling out the form. Much more difficult sections of the Constitution were given to the Negroes to write and construe than those given to the white applicants. Delay and refusal of deputies to serve the Negroes were uniform, whereas speed and dispatch, to the extent of permitting the applicant to sign immediately, were the lot of the white.

By extending the discriminatory treatment of the Negro applicants and thus discouraging further applications, a higher and higher percentage of the white residents of the county have become registered under the lax procedures, some of which were followed up until the very date of the trial. It does not help to say, as did the registrar on the trial, that he would see to it that all of the persons illegally registered would be stricken from the rolls, because there is no possible way to know how many thousands of white citizens of Panola County were registered by "just signing the book." Many of them may well be thoroughly qualified even under the most stringent requirements as they appear in today's statute. On the other hand, relatively few of them will ever have to face this hurdle. As it now stands every Negro citizen in Panola County, except two, who wish to become registered voters must satisfy the stricter requirements of today's law.

What, then, is the court's duty in such a situation? Ordinary principles of fairness and justice seem to indicate the correct answer. Would anyone doubt the utter unfairness of permitting the unrestricted application by the state of higher and stricter standards of eligibility to all of the Negroes of the county where 70% of the white voters of the county have qualified under sim-

ple standards or no standards at all, and where the Negro citizens were prevented from qualifying under the simpler standards by reason of a practice or pattern of discrimination?

"While theoretically applicable to all, these new requirements primarily affect those who bore the brunt of previous discriminations and tend to maintain the position of advantage which one class has already obtained over the other. See United States v. Louisiana, E.D.La. 1963, 225 F.Supp. 353, at pp. 391–398 (three-judge court); United States v. Atkins, 5 Cir., 1963, 323 F.2d 733, 743–745; cf., United States v. Dogan, 5 Cir., 1963, 314 F.2d 767," United States v. Ramsey, et al, 5 Cir., 331 F.2d 824, dissenting opinion of Judge Rives, page 833.

■ The obvious way to avoid such an unfair and inequitable result is by applying the principle of "freezing." The term "freezing" is used in two senses. It may be said that when illegal discrimination or other practices have worked inequality on a class of citizens and the court puts an end to such a practice but a new and more onerous standard is adopted before the disadvantaged class may enjoy their rights, already fully enjoyed by the rest of the citizens this amounts to "freezing" the privileged status for those who acquired it during the period of discrimination, and "freezing out" the group discriminated against. "Freezing results when there have been past discriminatory practices in the registration process, these discriminatory practices are discontinued, but new and more onerous requirements are imposed." United States v. Ramsey, supra, page 837.

■ "The cessation of prior discriminatory practices cannot justify the imposition of new and onerous requirements, theoretically applicable to all, but practically affecting primarily those who bore the brunt of previous discrimination. An appropriate remedy therefore should undo the results of past discrimination as well as prevent future inequal-

ity of treatment. A court of equity is not powerless to eradicate the effects of former discrimination. If it were, the State could seal into permanent existence the injustices of the past." United States v. State of Louisiana (E.D.La.) three-judge court, 225 F.Supp. 353, 393, prob. juris. noted, 377 U.S. 987, 84 S.Ct. 1916. See also Lane v. Wilson, 307 U.S. 268, 276, 59 S.Ct. 872, 83 L.Ed. 1281, where the Supreme Court said,

> "Exemption from this onerous provision was enjoyed by all who had registered in 1914. But this registration was held under the statute which was condemned in the Guinn case [Guinn v. United States, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340]. Unfair discrimination was thus retained by automatically granting voting privileges for life to the white citizens whom the unconstitutional 'grandfather clause' had sheltered while subjecting colored citizens to a new burden." 307 U.S. 276, 59 S.Ct. 876, 83 L.Ed. 1281.

This Court has also construed the term "freezing" as keeping in effect, at least temporarily, those requirements for qualification to vote, which were in effect, to the benefit of others, at the time the Negroes were being discriminated against.

In United States v. Dogan, this Court clearly approved the application of the principle of "freezing" where the record indicates that later and more burdensome requirements will maintain in effect a prior policy of discrimination. The District Court for the Middle District of Alabama in United States v. Penton, 212 F.Supp. 193, applied the principle by enjoining the defendants "from using * * different and more stringent qualification requirements for registration * * * than * * * [those] used by the Board * * * since at least January 1, 1956." This Court has further recognized the principle, although not applying it in that particular case, in United States v. Atkins, 5 Cir., 323 F.2d 733. The Court said there, "We do not dispute the power of the federal courts to invoke the freez-

ing principle to give relief when necessary. It has been used before in voting cases. * * *"

We have here an appeal from a final judgment and a denial of a permanent injunction. The case has been pending two and a half years. Effective relief is long overdue. The only effective relief here is by applying the principle of freezing the registration standards that were in effect when the great majority of the white citizens were registered. We conclude that the principle should be applied in this case without further delay.

We have considered the appellees' contention that the Court does not have the power under the Civil Rights Act to direct the registration of any person who is not otherwise qualified under the laws of the state of Mississippi. The argument goes that since it must be assumed that the Mississippi statutes are constitutional, the Court may not by its action require a suspension of the present statutes even though it appears that to do so is the only way to achieve real equality. We think that a provision of the 1957 Civil Rights Act, as amended in 1960, strongly supports the proposition that the relief sought is authorized by the statute. Subsection (e) of this Act, 42 U.S. C.A. § 1971(e), dealing with the authority of a court-appointed referee in the event of the failure of the state registrar to act as required by the statute, defines "qualified under state law" as follows: "qualified according to the laws, customs, or usages of the State, and shall not, in any event, imply qualifications more stringent than those used by the persons found in the proceeding to have violated subsection (a) of this section in qualifying persons other than those of the race or color against which the pattern or practice of discrimination was found to exist."

Obviously, when the court has found that a pattern of discrimination has denied an opportunity to Negroes to register, although it has permitted the registration of substantially all of the willing eligible white voters of a county,

a non-discriminatory reregistration of all voters would be the only completely fair and effective means of clearing away the effect of the discrimination. That path, of course, lies open to the state if it sees fit to pursue it. Thus, any remedial injunction freezing the earlier standards to permit the qualification of the Negroes discriminated against, must in the alternative, authorize the state to require a reregistration of all citizens using such standards of eligibility as meet constitutional requirements.[12]

Unless, and until, such reregistration is had, the disenfranchised class must be given a reasonable opportunity to get their names on the registration rolls on the same basis as was applied to the 5300 white voters who are now registered in Panola County.

 The United States contends that the trial court erred in dismissing the state of Mississippi as a party defendant. We agree that this is an appropriate case for the joining of the state. Not only does the statute expressly provide for such joinder, but here it is evident that the state's presence is essential to the granting of complete relief. The principle of freezing contemplates the temporary suspension of the state statutes regulating registration unless the state should see fit to cause reregistration of all the voters of this County. To become effective, this part of the order must include the state as a party.

We conclude that the trial court erred in not finding a pattern and practice of discrimination. We also find that the trial court erred in not issuing an injunction to guarantee that the effects of the

discrimination should be eliminated and a repetition for the future be prohibited.

 This Court has not the power, if it had the desire, which it has not, to prescribe the qualifications that will ultimately apply to the registration of voters in the state of Mississippi. The Court will therefore not undertake to deal with registrations as to persons who first became eligible to register following the date on which the present Registrar, Mr. Shankle, assured the Court that he would apply all of the present Mississippi statutes with an even hand and completely without regard to race. This, of course, assumes that Mr. Shankle will assure himself that such tests as are required of proposed registrants shall be fairly and uniformly given, including the selection in some completely fair and objective way of the sections of the Mississippi Constitution that may be required to be interpreted.

However, with respect to all Negro residents of Panola County who were otherwise qualified by residence and not disqualified by any of the statutory grounds of disqualification, they must be given an opportunity to register upon their subjecting themselves to the same requirements as were actually administered by defendant Duke and his deputies up until the date of the trial of this case in the district court.

Provided that reasonable opportunities to register are given to the Negro citizens of Panola County, there should be a limitation upon the time during which they may take advantage of this special registration. This Court will not attempt to frame the terms of the order to be issued by the trial court, but it is

12. To at least one seasoned observer the likelihood of subjecting all of the citizens of a state to the difficult subjectively-graded test that is now on the statute books is very remote. "Tests supplementary to literacy—ability to understand, explain, or interpret the constitution— * * * born of a union of constitutional fraud and political ineptitude * * * must in their nature be cloaks for the arbitrary exclusion of voters or tests for the possession of useless knowledge. * * * If any tests of understanding were applied at all to any substantial number of *citizens of status*, the registrars would be hanged to the nearest lamp-post and no Grand Jury could be found that would return a true bill. Suffrage requirements that cannot be made at least to appear nondiscriminatory in their application will sooner or later fall before the constitutional ban on racial discrimination." (Emphasis added.) Key, Southern Politics 577 (1949).

strongly suggested that a period of a year after the date of the trial court's order should be adequate for those Negroes who desire to do so to undertake to complete their registration upon the terms here outlined, provided, however, that the trial court shall satisfy itself that reasonable opportunities will be given during such period for all who desire to do so to offer themselves for registration.[13]

As further guidance to the trial court in the framing of its decree, we suggest that the defendants should be enjoined from determining the qualifications of Negro citizens in Panola County in any manner or by any procedure different from and more stringent than the following which have heretofore been used by defendant Duke and his deputies in determining the qualifications of white voters: (A) that the applicant is or will be 21 years of age or older prior to the next election; (B) that the applicant is entitled to apply for registration without regard to whether such applicant has previously paid poll taxes; (C) that the applicant be afforded the opportunity to apply and complete the application form when either the registrar himself or the deputy registrar is present; (D) that applicants be not required to apply one at a time but persons presenting themselves to apply for registration shall be permitted to complete the applications simultaneously to the extent that the physical facilities of the registration office reasonably permit; (E) that applicants be advised at the time they apply, if a registrar or his deputy is present, as to whether they are accepted or rejected and, if they are accepted, that they be registered at such time.

The order should also require that in conducting registration of voters in Panola County, the defendants must not use any qualifications as a prerequisite to registration other than the following which we conclude have heretofore been used by Duke and his deputies with respect to the registration of white applicants:

1. He is a citizen and is or will be 21 years of age or older at the time of the next election;

2. He has resided in the State two years and in the election district in which he intends to vote one year;

3. He embraces the duties and obligations of citizenship as demonstrated by his willingness to take and sign the oath to bear allegiance to the Constitution of the United States and the State of Mississippi;

4. He is not disqualified by reason of conviction of a disqualifying crime, insanity or idiocy;

5. He is able to demonstrate a reasonable ability to read and write by completion of Questions 1 through 18 of the application form with or without assistance by defendant Duke or his agents, as needed.

The trial court should also require that the defendant registrar and his successors file a monthly report with the Clerk of the trial court with a copy to be mailed to the plaintiff's counsel monthly showing the names and dates of application for registration during the previous monthly period and the race of the applicant, the action taken on the application, and, if the application is rejected, the specific reason or reasons for such rejection. The first of such reports shall cover the period from the date of the last application form, presented at the trial in this case, March 16, 1963.

The trial court shall retain jurisdiction of the case in order to make certain that the registration records of Panola County are made available to attorneys or agents of the United States at all reasonable times in the office of the Circuit Clerk in Sardis and in Batesville for the purpose of inspection, copying and photographing.

13. This period can be equated with the one year provision of 42 U.S.C.A. § 1971(e) dealing with court action qualifying persons to vote.

It being called to the attention of the Court that Ira Shankle, Esquire, has now succeeded to the office of Registrar of Panola County, Mississippi, it is ordered that the said Ira Shankle be, and he is hereby substituted as a party defendant in this proceeding in accordance with the provisions of Rule 19(4) of this Court.

The judgment of the trial court is reversed and the case is remanded for further proceedings not inconsistent with this opinion.

Since the appellant was entitled to the injunction following the conclusion of the trial, we conclude that no further delay should be occasioned and therefore direct that the mandate issue forthwith.