**Reverend A. L. DAVIS, Earline Nealey and Caleb Hadley, and all Negroes Similarly Situated, Plaintiffs,**

v.

**A. P. GALLINGHOUSE, Registrar of Voters of the Parish of Orleans, State of Louisiana, Honorable John J. McKeithen, Governor of Louisiana, and the Board of Registration of the State of Louisiana, Comprised of Honorable John J. McKeithen, Governor of Louisiana, Vail M. Delony, Speaker of the Louisiana House of Representatives, and C. C. "Taddy" Aycock, Lieutenant Governor of the State of Louisiana, Defendants.**

**Civ. A. No. 15910–B.**

United States District Court
E. D. Louisiana,
New Orleans Division.

Sept. 30, 1965.

Robert F. Collins, Collins, Douglas & Elie, New Orleans, La., James M. Shellow, Shellow & Shellow, Milwaukee, Wis., Earl J. Amedee, New Orleans, La., John M. Darrah, Seattle, Wash., for plaintiffs.

Sidney W. Provensal, Jr., Cahn & Provensal, Joseph J. Laura, Jr., New Orleans, La., for defendant A. P. Gallinghouse.

William P. Schuler, Asst. Atty. Gen., for defendants Honorable John J. McKeithen and the Board of Registration of State of Louisiana.

FRANK B. ELLIS, District Judge.

On August 6, 1965, the President signed into law the Voting Rights Act of 1965 (Public Law 89–110). On August 11, 1965, A. P. (Tim) Gallinghouse, Registrar of Voters of Orleans Parish (hereinafter sometimes referred to as the "Registrar") announced that his office would begin complying with the Voting

Rights Act; at the same time he filed suit challenging the constitutionality of that act.[1]

In the present suit, filed August 31, 1965, plaintiffs, allegedly representing all Negroes qualified to register to vote in Orleans Parish, level a shotgun complaint at the defendants, Gallinghouse, Governor John J. McKeithen, and the members of the State Board of Registration. Trial of the matter was held September 9, 13, 14 and 15, 1965. The court dismissed Governor McKeithen from the suit in his capacity as Governor, while retaining the Registration Board, one of whose members is the Governor.[2]

The background circumstances giving rise to the present suit are as follows: subsequent to the passage of the Voting Rights Act, large numbers of prospective registrants appeared at the Registration Office and formed long lines waiting to get into the office. Because of the requirement that registrants document identity and residence, members of the Interdenominational Ministerial Alliance patrolled the lines checking the documents of prospective registrants to see if they were in order. If not in order, the ministers would send the registrant home to get the proper papers, saving his place in line so that when he returned he would not have to wait in line again. If a person entered the Registrar's office and there was told that his documents were not in order, he, after returning from home with the proper documents, would be escorted into the office ahead of the line, thus causing him no further delay.

Sifting through plaintiffs' allegations, proof and argument, these main charges emerge:

I.    That the Registrar has, in the application of the rules of his

1.  Gallinghouse v. Katzenbach, Civil Action #15863–C (E.D.La.).

2.  The Board of Registration is created under Article 8, § 18 of the Louisiana Constitution, and has the power to remove any registrar and to adopt necessary rules

for registration procedures in the state. Under the above Article and Section 18:1 of the Louisiana Revised Statutes, the Governor has the power to appoint the registrar for the parish of Orleans; this was not sufficient cause to hold the Governor in the suit.

office concerning identification and proof of residence, discriminated against Negroes;

II. That the Registrar has, even if on a non-discriminatory basis, deliberately slowed down the registration process, thereby discouraging prospective Negro registrants, by demanding unlawful and unreasonable proof of residence and engaging in other slow-down practices;

III. That even if present registration requirements are lawful and non-discriminatorily applied, these requirements, which the Registrar initiated early in his tenure of office, differ from the requirements in effect in earlier years when discrimination against Negroes was practiced and thereby must be struck down under the "freeze-out" doctrine approved in Louisiana v. United States, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965).

## I. DISCRIMINATION

■ As to the first charge, there is simply no proof in the record of discriminatory application of the registration requirements. Plaintiffs made many grave charges, but did not offer the proof to support them.[3] The complaint alleges discrimination since August 11, 1965. The Court is well aware that, in the past, there was discrimination against Negroes in the registration process. But plaintiffs' present suit needs more than an *ipse dixit* to prevail. Orleans Parish is not one in which the statistics of voter registration alone demand a finding of discrimination.[4] The registration figures since August 11, 1965, are as follows:

August 11 to September 7 (start of this trial)

|  | Literates | Illiterates | Total |
|---|---|---|---|
| Whites | 579 | 28 | 607 |
| Negroes | 5317 | 1442 | 6759 |
|  | 5896 | 1470 | 7366 |

August 11 to September 24 [5]

|  | Literates | Illiterates | Total |
|---|---|---|---|
| Whites | 1738 | 54 | 1792 |
| Negroes | 8353 | 2075 | 10428 |
|  | 10,091 | 2129 | 12,220 |

Since the statistics do not indicate discrimination there must be some other form of substantial proof made. In finding that there has been no discrimination against Negroes in the registration process since August 11, 1965, this Court does not feel it is shutting its eyes "to what all others than we can see and

---

3. Compare the evidence presented here— seven persons who registered or attempted to register, three ministers, and the Registrar—with United States v. Penton, 212 F.Supp. 193 (M.D.Ala.1962). Argument does not replace evidence; there was much argument in the instant case, but little evidence to support it.

4. For one extreme example of a case that could stand on statistics alone, see Chief Judge Tuttle's ironic introduction in United States v. Duke, 332 F.2d 759 (5th Cir. 1964). See also United States v. Ward, 222 F.Supp. 617 (W.D.La.1963).

5. New Orleans States-Item, September 25, 1965.

understand,"[6] but rather is making an analytic finding in accord with reality and the evidence.

There was no evidence introduced into the record of the total number of people turned away for lack of adequate documentation of residency. The fact that the Registrar's office does not keep such records does not relieve plaintiffs of the burden of producing testimony from those who were allegedly turned away. The ministers in the hall would have been aware of any such people, and plaintiffs' counsel could readily have produced them.

■ The proof is that both whites and Negroes would be sent away if documentation was inadequate. There was testimony from one Negro man indicating he may have had adequate documents and was turned away. Four days of trial elicited only this single illustration of one possibly qualified Negro who was not accepted. Where there is a general policy for all, Negro and white, then there is no discrimination because of race where there are isolated cases of people who do not receive identical treatment.[7] In fact, plaintiffs' own witness, a Negro minister who checked the documents of prospective registrants in the hall, testified that the Registrar's office was operated on a non-discriminatory basis.[8]

■ Plaintiffs contend that because a flexible standard as to what constitutes sufficient documentation of residence is used, discrimination can be practiced under the guise of applying the standard. But the standard here is not a patently objectionable one, such as a "constitutional interpretation" test, and although flexible standards, fair on their face, have been struck down in other cases because of discrimination worked, or workable, under them,[9] there has here been no showing that the residency documentation requirement has been used unfairly. The Board of Registrars circulated a suggested list of documents that may be used to properly support residence.[10] The Registrar modified that list and adopted instead a generally less strict standard. He requires only that a registrant document that he resided at the address at which he desires to register more than 90 days prior to the date of registration.[11] The standard for proper documentation may be stated as a document or group of documents created by some person or agency other than the registrant, for some purpose other than demonstrating that registration requirements are met, bearing a date at

6. United States v. Butler, 297 U.S. 1, 61, 56 S.Ct. 312, 317, 80 L.Ed. 477 (1936).

7. Williams v. McCulley, 128 F.Supp. 897, 899 (W.D.La.1955).

8. See text accompanying n. 15.

9. Byrd v. Brice, 104 F.Supp. 442 (W.D. La.1952).

10. " * * * (a) Drivers license bearing name of applicant and showing address to be in state and parish which was issued at least one year prior to date of application for registration. New act provides for parish residence of only six months. (b) Homestead exemption certificate for previous year. (c) Receipt for deposit on utilities (electricity, water or gas). (d) Library card for previous year. (e) Selective Service registration card. * * * (f) Rent receipts for past twelve months. (g) Deed or contract to purchase home (one year old). (h) Hunting or fishing license for pre-

vious year. (i) Copy of application for automobile license plates for previous year. (j) Letter from reputable firm or individual stating that they know the applicant personally and that applicant has lived in the state and parish for the required period as prescribed by law. * * *"

11. The Registrar thus determines that the applicant lived at the address at least 90 days previously. In order to insure that the applicant lives there at the time of registering, a card is sent to that address after registration is completed. If the registrant does not live there, the card is returned. Thus continuing residence for the requisite period is checked. The Registrar does not require proof of residence in the state for one year and the parish for six months, but rather only residence in the precinct for three months. See Article 8, § 1 of the Louisiana Constitution and Section 18:31 of the Louisiana Revised Statutes.

least 90 days old but not so stale as to cast doubt as to why something more recent could not be obtained, showing the name and address claimed. The flexibility arises from the discretion given the deputy registrars to determine whether a document meets that standard. They do not have an arbitrary power to give or withhold consent, but merely a discretion to be exercised upon a consideration of the circumstances of each case.[12]

Plaintiffs admit that a rigid standard, requiring certain specific documents, could work a hardship on some members of their class, who might not have a specific document, such as a driver's license. The standard used is not an onerous procedural requirement to effectively handicap exercise of the franchise by the colored race,[13] but is made easy for them to meet.[14]

█ For this reason the Court feels that the present standard should be upheld, provided it is applied fairly. And the evidence shows that it was applied fairly. If the deputy registrar decides that the proferred documents are inadequate, the registrant is referred to one of the deputy's supervisors, Mr. George Bull, and Mr. Bull decides as to the sufficiency of the documents. Of Mr. Bull's handling of the problems, one of the plaintiffs' witnesses had this to say[15]:

"Q And I take it from your testimony that you believe that Mr. Bull in that position has corrected mistakes made by deputy registrars, and has permitted people to vote—I mean to register to vote?

"A Yes, sir.

"Q Now, isn't that basically what you discussed with Mr. Gallinghouse on your first visit with him where you asked that when

persons were turned down that there be a sort of an appeal permitted to a so-called higher authority?

"A We didn't ask this; this is what was told us, that if we found any problems in regard to this, that we could bring the people in to him and he would see that the matter was corrected.

"Q Isn't it a matter of fact that this has been done through the offices of Mr. Bull?

"A Mr. Bull has been doing that essentially, yes.

"Q He has been doing that essentially?

"A Essentially, yes.

"Q And, generally, don't you believe Mr. Bull has handled that, has handled his decisions in a non-discriminatory and fair manner?

"A Yes. I stated earlier as far as Mr. Bull's work and so forth, I mean, this is quite all right. Oh, no, I have nothing to say against Mr. Bull and his activities at all—no.

\* \* \* \* \* \*

"Q In other words, most persons that are turned down are brought to Mr. Bull, and it is further your testimony that Mr. Bull has administered and used his discretion in a wise, fair and equitable manner? Is that correct?

"A I don't accuse Mr. Bull of discrimination; no, sir."

The Court finds no support for the charge that the requirement of documentation of residence is being applied in a discriminatory fashion.

12. Compare Yick Wo v. Hopkins, 118 U.S. 356, 366, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

13. See Lane v. Wilson, 307 U.S. 268, 275, 59 S.Ct. 872, 83 L.Ed. 1281 (1939).

14. This case is unlike United States v. Ward, 222 F.Supp. 617 (W.D.La.1963), in which the registrar refused to accept any proof from Negroes.

15. Testimony of Reverend Milton Upton, upon cross-examination by Mr. Schuler.

In connection with the charge of discrimination, one other contention is made. In Orleans Parish, as well as in the rest of Louisiana and much of the South, there exists, especially on the local level, a virtual one-party system, so that "nomination is tantamount to election". In most instances, then, an effective ballot is cast only if the elector votes in the Democratic primary. And to vote in a party primary, an elector must declare his affiliation with that party.[16] The contention is made, with regard to the illiterate Negroes who have been allowed to register since the passage of the Voting Rights Act,[17] that they are being duped into affiliating with some party other than the Democratic one. The registration form has a line on which the registrant can choose as his affiliation "Democrat", "Republican", "States Rights", "None", or "Other". The charge is that against the express response of the applicants or without having asked them, deputy registrars have marked something other than "Democrat", usually "States Rights", or have left the question blank, and thereby effectively disenfranchised the registrants.

There was offered two types of proof for this point, first, testimony of three witnesses, and second, the tabulation of the choices of party affiliation made by both illiterate and literate Negroes.

The testimony of the witnesses is unconvincing. On cross-examination and questioning by the Court, the witnesses testified that they did not know what a political party is, and were very hesitant and unsure about what had happened in the Registrar's office and about the names of various parties. Under cross-examination one witness stated that she was for "States Rights". Yet all were sure they said, or would have said, "Democrat".

The study of the registration records as to choice of party affiliation showed that the registrants made the following choices; the table also expresses the number of registrants making a particular choice as a per cent (rounded to the nearest whole number) of the total of that class registered in the period in question.

| | Total | Democrat [18] | Republican | States Rights | None | Other | Left Blank |
|---|---|---|---|---|---|---|---|
| Literate Negroes | 5317 | 4015 – 76% | 57 – 1% | 46 – 1% | 121 – 2% | 3 – 0% | 1075 – 20% |
| Illiterate Negroes | 1442 | 939 – 65% | 77 – 5% | 61 – 4% | 183 – 13% | 1 – 0% | 181 – 13% |
| Whites | 607 | 594 – 98% | 6 – 1% | 0 – 0% | 5 – 1% | 0 – 0% | 2 – 0% |

The tabulation is inconclusive. Plaintiffs' counsel contends it shows that illiterate Negroes were duped; on the contrary, just as valid an assumption is that the illiterates are not as intelligent or conversant with political affairs as the

16. Louisiana Revised Statutes, §§ 18:33 and 18:308.

17. Section 4(a) of that Act prohibits certain states from denying a citizen the right to vote for his failure to comply with a test or device. The definition of test or device includes [§ 4(c) (1)–(2)] demonstrating the ability to read, write, understand, or interpret any matter or demonstrating any educational achievement or knowledge of any particular subject.

18. The figure in the Democrat column was arrived at by the Court by subtraction. No actual count of cards indicating "Democrat" was made, and thus there was no cross-check as to the complete accuracy of the figures; however, the Court and all parties were satisfied as to their substantial accuracy.

literates, and, thereby, a higher percentage made the "wrong" choice by affiliating with the "rights" party. Almost one-fourth of the literate Negroes did not choose "Democrat"; the fact that 35% of the illiterates did likewise is not conclusive. At most, the tabulation alerts the Court to possible injustice, but without a credible showing that those whose cards indicate they did not choose "Democrat" were either not asked the question or expressed some other preference, the Court cannot find that injustice was done. A ruse such as that alleged would be an insidious method for disenfranchising illiterates, and the Court would be quick to strike it down. But the tabulation and the inherently self-contradictory testimony of the witnesses does not outweigh the testimony of the Registrar and deputy registrar, who appeared candid and sincere to the Court.

In connection with this, plaintiffs' counsel makes much of the fact that the questions were left blank on many of the illiterates' cards. A deputy registrar testified that she left it blank rather than circling "None" when the applicant showed no comprehension or interest in the question. The court fails to see any practical difference between a blank and "None" despite the urging of plaintiffs' counsel that a blank is many times more terrible an injustice.

█ Collateral to the above findings, the Court does not feel it is the duty of a deputy registrar, confronted by an illiterate who does not comprehend the meaning of "political party" and who does not realize that, in most instances, he will cast an effective ballot only if he affiliates with the Democratic Party, to go beyond a very simple explanation of what a party is. The Court will not order a deputy to explain the primary system in such a manner that it becomes an order for the registrant to affiliate with the Democratic Party. The practical penalties for failure of an illiterate to comprehend this question must be borne by the illiterate. It would be a more grievous violation of our free election system to require a deputy to register all illiterates "Democrat".

## II.  SLOW-DOWN

The second charge has several facets. One of the elements of this slow-down charge is an allegation that any requirement of proof of residence for the statutory period is unlawful.[19] Because Article 8, Section 1(e) of the Louisiana Constitution specifically states that an applicant for registration must be able to prove his identity,[20] plaintiffs claim that any requirement that an applicant prove any other qualifications is unlawful.

█ This Court is not going to make that negative inference. Where definite qualifications are required by the Louisiana Constitution and statutes [21], reasonable requirements of proof of these qualifications can be inferred from the laws. Plaintiffs have pointed to no Louisiana law banning the Registrar from asking for reasonable proof of all qualifications, and this Court will not assume that the Louisiana Legislature intended to hamstring a Registrar by

19.  There is also a question as to whether Louisiana law demands that the residence requirements be met at date of registration, or if it suffices to meet the requirements by the date of the next election. That point is squarely in issue in this Court in Perez v. Rhiddlehoover, Civil Action #15914–B. No allegation was made in the present case that persons who would meet the requirements by date of election were turned away for failing to meet them at the date of attempted registration. Therefore the Court finds it unnecessary to decide that question here.

20.  Section 18:37 of the Louisiana Revised Statutes expands on the constitutional provision, and provides for proof of identity by the voucher of two registered voters. This requirement of the statute is banned by the Voting Rights Act, see text p. 217.

21.  Article 8 Sections 1 and 6 of the Louisiana Constitution and Sections 18:31 and 18:42 of the Louisiana Revised Statutes set down the basic qualifying and disqualifying factors.

telling him he cannot ask for proof of any qualifications.

Plaintiffs allege that to do so impinges on the essential dignity of man in that it impliedly indicates mistrust of the sworn affidavit of the applicant. The Court is aware that the protection of the Bill of Rights has been extended to areas which are not specifically within its wording, but which are within its penumbra.[22] But this Court is not going to be so naive as to state that in the important affairs of life, among them voting, the sworn statement of the person asserting a right or possible right must be accepted. The standard jury instruction this Court gives in all jury cases mentions, in connection with the credibility of the witnesses, that the fact that a witness is under oath does not mean that his word must be accepted, "for anyone can lie if he has the will to do so." Based on the simple reality that people will perjure themselves, there is a valid reason for requiring proof of qualifications in all affairs of life. A man's rights are valuable only insofar as they are protected. One of the ways to do this is by careful scrutiny of those who assert those rights, to insure that the assertor is indeed entitled to them, lest the rights of the true owner be diluted by the claim of the fraud. An honest man does not resent this. He realizes that the small inconvenience or "indignity" he suffers by not having his statement accepted at face value is far outweighed by the protection he gets from the faker who might come in unchallenged. Part of the right to vote is the right not to have your vote diluted by the vote of those who are unqualified. To be asked to prove his qualifications for voting does not degrade a man and rob him of his dignity. Rather, it protects the very right he is seeking to assert.

Plaintiffs' counsel would have the court limit the remedy for false swearing to criminal penalties.[23] The fact that the applicant who gives false statements may later be subject to criminal penalties does not remedy the harm resulting from the tabulation of illegal ballots. Based on the above reasoning this court concludes that *reasonable* requests of proof of qualifications to vote are neither unlawful nor repugnant.

Moreover, the requirements for proof of residency involved here are reasonable. Residency is a fundamental, positive requirement for voting in an area,[24] and the proof of it is simple. This is not to say that a registrar could demand documented proof of all the requirements for voting. Proof of some of the requirements would be unreasonable, for example, any of the negative requirements: non-conviction of a felony, non-desertion from the Armed Forces, not ever declared insane by any court, and, under the law as it was prior to the striking of good moral character requirements as tests and devices under the Voting Rights Act[25], not the parent of an illegitimate child within the last five years and not living by common-law marriage. Also, with regard to the native-born, proof of the positive requirement of citizenship by presentation of a birth certificate could be unreasonably burdensome to plaintiffs' class, since, until recently in this State, accurate records of birth were not kept in rural areas. To require a birth certificate could thus disqualify many of plaintiffs' class. But to prove residence for the required peri-

22. See Griswold v. State of Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

23. Voting Rights Act of 1965 § 11(c); Louisiana Revised Statutes § 18:222.

24. Lassiter v. Northampton County Board of Elections, 360 U.S. 45, 51, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959); Estopinal v. Michel, 121 La. 879, 46 So. 907, 19 L.R.A., N.S., 759 (1908).

25. The definition of test or device includes [§ 4(c) (3)] requiring that a person possess good moral character. See n. 17. This definition does not proscribe any requirement that an applicant be free of conviction of a felony or mental disability. See Joint Statement of Individual Views of the Committee of the Judiciary, Senate Report No. 162, part 3, p. 24.

od, a wide variety of documents are acceptable. There was no showing that any prospective registrant who met the residence requirement was, or would be, unable to prove it by any of the possible combinations of proper documents. Rather, it would seem to be very easy for the legitimate applicant to meet this requirement so long as no one specific document or documents were demanded. The Court finds that the requirement of proof of residence is reasonable as well as lawful and consonant with human dignity.

The Court finds no support for the argument that documentation of residence comes within the Voting Rights Act ban on tests and devices.[26] Section 4(c) (4) of the Act includes in the definition of test or device any requirement that a registrant "prove his qualifications by the voucher of registered voters or members of any other class." Plaintiffs' ingenious theory would have documentation become the equivalent of the "voucher of members of a class", that is, the Court imagines, the class of people who issue driver's licenses, library cards, rent receipts, postmarked envelopes, etc.

Congress undoubtedly meant this ban on "vouching" to hit at the requirement in some states that identity be proven by the voucher of two registered voters, which, where all or a large majority of the registered voters are white, minimizes the possibility of a Negro registering.[27] This court is not going to extend Congress' use of the language "voucher of members of any other class" to proof of residence that can be accomplished by a variety of documents.

Even without imaginative merit is plaintiffs' contention that the Registrar is administering a literacy test, in derogation of the ban imposed by the Voting Rights Act.[28] The deputy registrar hands the registration form to the registrant, and asks him to read the clause on the penalty for false statements. If he cannot read it, the registrar handles the registrant as an illiterate, and completes the form for him, after reading the clause to him. If the registrant can read it, he is classed as a literate, and completes the form himself. In no way is this a test of qualifications, since both the literate and illiterate qualify to register. This contention and argument of plaintiffs was frivolous and without merit.

Thus, as there is no showing of impropriety in the requirement of documentation of residence, this Court will not order its discontinuation as long as a pattern of discrimination does not develop under it. We are not at liberty to impose our concept of administration on the Registrar[29] and, absent a showing of impropriety in the registration process, any changes ordered by this Court would be just that.

The other element of the slow-down charge grows out of plaintiffs' belief that the Registrar's office is understaffed. Plaintiffs ask that the court order the hiring of more deputies. Again, this is a matter of office administration, and without a clear showing of a purposeful slow-down, the Court is not going to involve itself in the myriad complexities connected with hiring deputies, such as budget authorizations, Civil Service regulations, preliminary training, and probationary periods.

Louisiana law[30] provides for twenty-five deputy registrars in Orleans Parish, plus such temporary deputies as may be necessary. At present, due to budgetary limitations and Civil Service regulations, there are 22 deputy registrars. Vaca-

---

26. See n. 17.

27. Louisiana has this requirement. Louisiana Revised Statutes § 18:37. For one example of the effect it can have when used as a tool for discrimination, see United States v. Manning, 205 F.Supp. 172 (W.D.La.1962).

28. See n. 17.

29. Williams v. McCulley, 128 F.Supp. 897, 899 (W.D.La.1955).

30. Louisiana Revised Statutes § 18:6(1).

tions and sickness reduce the complement available in any given week.[31] The Court feels that the Registrar is aware of his responsibilities and that he has assembled a staff sufficient to meet the needs of the people his office serves. There is no evidence, in the record or elsewhere, that would indicate bad faith or a deliberate slow-down on the part of the Registrar. This Court will not take over the functions of the Registrar with respect to management of personnel unless it is proven necessary that it do so.

## III. FREEZE-OUT

The third charge alleges that the "freeze-out" doctrine bans the requirement of proof of residence, even if that requirement is fairly applied and otherwise permissible. The Registrar took office in 1961. By his own testimony, he initiated some changes in office administration and procedure shortly after beginning his duties. One of these changes, purportedly to curb abuses previously existent, was to tighten up the requirements for proof of residence.

The freeze-out doctrine, as enunciated by the Fifth Circuit [32] and recently applied by the Supreme Court in Louisiana v. United States, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965), directs that where a state, because of past discriminatory practices, has registered a large proportion of its white citizens but only a small proportion of its Negro citizens, that state cannot then put into effect a more stringent qualification for voting. The reason for this is that the higher standard would, of course, keep many of the unregistered citizens from qualifying to vote. These unregistered persons would necessarily be mainly Negroes. Therefore, even if the new qualifications were completely fair and applied fairly, they would operate in a discriminatory manner because of past faults.

■ This Court is altogether in agreement with the freeze-out doctrine and notes that Congress has used a similar principle in the Voting Rights Act.[33] The sole question here is whether it is applicable here. The Court will assume that there has been prior discrimination against Negroes in Orleans Parish, and will even assume that the difference between the percentage of eligible whites registered and the percentage of eligible Negroes registered is so great as to warrant general application of the doctrine in Orleans Parish. Nonetheless, the Court does not find that proof of residence is a new test or qualification within the scope of the freeze-out doctrine. Proof of residence is not a *higher* standard which might prevent people from registering. The *same* standard—residence for a certain period—is required. A person who met the requirement before 1961 but could not register because of discrimination is not now frozen out—he can now register. All he need do is make a simple showing that he has resided where he claims for 90 days. The Court does not find that this requirement cannot be met with a reasonable amount of effort upon the registrant's part.

Therefore, it is ordered that the motion of plaintiffs A. L. Davis, et al., for a preliminary injunction be, and the same is hereby, denied.

---

31. The number of deputies actually at work was as follows:

| Week of | # |
|---|---|
| August 11 | 21 |
| August 16 | 21 |
| August 23 | 16 |
| August 30 | 19 |
| September 8 | 19 |
| September 13 | 21 |
| September 20 | 20 |

32. See United States v. Atkins, 323 F.2d 733, 743–45 (5th Cir. 1963).

33. Section 5 of that Act requires that a state in which tests or devices are banned seek permission before applying any voting qualification different from those in effect on November 1, 1964.